[No. 23357.   *En Banc.*   July 26, 1932.]

THE STATE OF WASHINGTON, *Respondent,* v. MARIE CARR, *Appellant.*[1]

*W. B. Mitchell,* for appellant.

*Chas. W. Greenough* and *Frank Funkhouser,* for respondent.

PARKER, J.—The defendant, Mrs. Carr, was, by information filed in the superior court for Spokane county, charged with the crime of larceny by embezzlement, as follows:

"That the said defendant, Marie Carr, in the county of Spokane, state of Washington, between the dates of October 18th, 1929, and December 15th, 1929, then and there being, did then and there wilfully, unlawfully and feloniously, having in her possession, custody and control as agent money of the value of three hundred and ninety-five dollars ($395.00), secrete, withhold and

[1]Reported in 13 P. (2d) 497.

appropriate the same to her own use, with intent to deprive and defraud the owner, R. W. Wyrick, thereof."

This is a charge under that portion of Rem. Comp. Stat., § 2601, reading as follows:

"Every person who, with intent to deprive or defraud the owner thereof—   . . .

"(3) Having any property in his possession, custody or control, as   . . .   agent,   . . .   shall secrete, withhold or appropriate the same to his own use or to the use of any person other than the true owner or person entitled thereto;   . . .

"Steals such property and shall be guilty of larceny."

Mrs. Carr pleaded not guilty. The case proceeded to trial in the superior court, sitting with a jury, resulting in a verdict finding her guilty as charged. Final judgment was accordingly rendered against her, from which she has appealed to this court.

It is here contended in behalf of Mrs. Carr that the evidence does not support the verdict and judgment rendered against her, and that therefore she is entitled to reversal of the judgment and dismissal of the case. This is the principal contention discussed in the briefs of respective counsel, and the only one which we find it necessary to notice. As we proceed, it will appear that the principal question to be decided is as to whether the alleged embezzled money was received by Mrs. Carr as agent for Wyrick or as a down payment by him to her upon the purchase price of the sale of a piano from her to him, the piano to be delivered to him later.

Preliminary to a critical examination of the state's evidence, we adopt the introductory statement made by counsel for the state in its brief, as follows:

"The appellant was operating the Del Mar Music Shop at Hillyard, Washington. She bought and sold

victrolas, radios and pianos and conducted a general music store. One of her customers was R. W. Wyrick, the injured party herein. Wyrick had a daughter approaching her twenty-first birthday, and he and his wife wanted to present the daughter with a Haddorf grand piano for her birthday. The Wyricks had two old pianos, to wit: a McPhail and a Chickering, which they wished to trade in on the Haddorf. The appellant and Wyrick had been dickering on a deal for some time and the deal was finally consummated October 18th, 1929, at the Wyrick home, those present being appellant and Mr. and Mrs. Wyrick. The retail price of the Haddorf piano was $1,275.''

The trial judge duly certified that the statement of facts ''contains all the material evidence, oral or in writing, either in narrative form or by question and answer.'' Our quotations are made from the statement of facts accordingly.

Wyrick, the principal witness for the state, testified as follows:

On examination in chief: ''My name is R. W. Wyrick, and Mrs. R. W. Wyrick is my wife, and I know Mr. Jason and also know the defendant, Marie Carr, and had business dealings with her in October, 1929. I called on Mrs. Carr several times and talked over the matter of securing a grand piano, and after we looked around considerable at different makes, we decided on a Haddorf. She told me she could get it and would have to order it through the· wholesaler, Mr. Jason. We agreed on the price. The retail price of the piano was $1,275. She said if I would give her $592 cash and two pianos I had, a McPhail and a Chickering, she would deliver the piano to me. She came to my house on October 18, 1929, in the evening, in the presence of my wife and myself and made the statement that Mr. Jason would have to have a $500 payment before he would order the piano. He did not carry them in stock. I told her $400 was all that I could spare that day. I gave her a check for that amount and she gave me a receipt.''

The receipt was then introduced in evidence, reading as follows:

"Oct. 18th, 1929.

"Received of R. W. Wyrick four hundred and no/100 dollars part payment on a Haddorf Grand Piano & Victor Radio.

"(Signed)  Del Mar Music Shop,
"M. Carr."

"Q. What was this Del Mar Music Shop? A. That was the name of the business she was operating at Hillyard. Q. What happened after you gave her that check and got the receipt? A. On November 2nd I gave her the balance of the $500, which was a $100 check, and she promised the piano about the 10th of November. That day came and the piano hadn't arrived."

Here another receipt was introduced in evidence, given by Mrs. Carr to Wyrick, reading as follows:

"Nov. 2, 1929.

"Received of R. W. Wyrick one hundred and no/100 dollars as part payment on a Haddorf piano.

"(Signed)  Del Mar Music Shop,
"M. Carr."

"Witness then testified that he waited and the piano came [manifestly meaning it came to Jason, the wholesaler] and he [Wyrick] asked Marie Carr to deliver the piano to him. Q. And up until this action was brought February 14th had you received that piano? A. No, sir. Q. Did Marie Carr ever give you the money back? A. No. Q. In that receipt for part payment on a Haddorf Grand and a Radio, tell us about that radio, whatever it was? A. It was a Victor Radio. The price of the radio was $105 and deducting that from the $500 I had given her made my net loss $395. The balance due, according to agreement, was $197, to be paid on the piano, and the two second hand pianos that I had. Q. I will ask you if she agreed to dispose of your old pianos for you? A. She accepted those pianos as a part payment on my piano and allowed me the difference between the original purchase price and the amount of cash I was giving her. Q.

How much was she to allow you for those old pianos? A. $683."

On cross-examination: "Q. Did you receive a Haddorf Grand Piano from Mr. Jason? A. Yes. Q. You turned those two pianos over to Mr. Jason, did you? A. Yes, sir. Q. And how much did you pay Mr. Jason? A. I don't remember. Q. Was it more than $500? A. I don't remember. Q. Was it less than $500? A. I don't remember. Q. You bought the piano of her under a retail price, $1,275, didn't you? A. Yes, sir. Q. And she was to buy her own piano at whatever price she wanted? A. She said she had to buy it from him because she didn't handle it and he was the only source, and he wouldn't order it until he had the $500. I gave her the $500 with the distinct understanding, and she agreed in the presence of my wife that that was what she was going to do with the money. Q. And she told you that she had to buy it at wholesale price, at her own figures, from Mr. Jason, the wholesaler? A. I presume she did."

Mrs. Wyrick testified, on direct examination, for the state, as follows:

"Mrs. Carr came to our home concerning this transaction on the 18th day of October, 1929, and I saw my husband give her a $400 check and she gave my husband a receipt for that money. He was to give her another $100 on or about the 1st of November, which he did, on the second of November. She said that Mr. Jason would demand $500 before he would order this grand piano; he had to have this money in hand before he would order it."

Mr. Jason, the wholesale dealer, testified for the state, as follows:

"I had conversation with Marie Carr concerning the purchase of a Haddorf Grand Piano about the middle of October, 1929. She came to my office and said that she had a prospect for a grand piano, and I told her I could supply it for her. She wanted a Haddorf, and I told her we would be glad to order it for her but we would have to have $500 paid down before we sent in

the order.  Q.  What happened later?  Did she come back again and tell you who it was for?  A.  Yes.  She came to the office again several times and said the deal was about completed and that she would have the money very soon.  It went on then for some time, and finally she told me that the piano was to be ordered for Mr. Wyrick.  I told her if it was for Mr. Wyrick I would go ahead and order it, that his credit was good with me.  Q.  Did you receive from her the $500?  A.  I did not.  Q.  Did you order the piano?  A.  Yes, sir. When the piano came, I called Mrs. Carr and she said she would be down and see me in a few days, but she did not come and I called her again and she said the money would be there in a few days.''

After the piano was received by Jason, and it appearing to him that the sale of it to Mrs. Carr was not going to be consummated, he dealt directly with Wyrick, selling the piano direct to him and receiving in payment thereof the two old pianos and the balance presumably in money, the amount of which is not shown and as to which Wyrick does not remember.  There is no evidence in the record indicating that Wyrick was to compensate Mrs. Carr in any manner for procuring the piano for him as his agent.  On the contrary, the evidence renders it plain that her profit was to be the difference between the wholesale price she would pay Jason for the piano and the retail price of $1,275, for which she was to sell it to Wyrick.

A critical reading of the whole of the evidence, as brought here in the statement of facts, renders it plain to us that the foregoing summary is as favorable to the state's case as can be made from the evidence introduced upon the trial.  Mrs. Carr's testimony. does not contain any admissions upon her part of facts pointing to any relation between her and Wyrick in connection with the deal indicating other than that the deal

was a contract for the purchase of the piano by him from her.

■ It seems plain to us that the foregoing summary of the facts calls for the conclusion that the relation between Mrs. Carr and Wyrick was that of seller and buyer, and not that of principal and agent. She was engaged in buying and selling victrolas, radios and pianos, and for that purpose was conducting a general music store. She was not, in the contemplated procuring of the piano from Jason, doing anything for Wyrick for which he was to compensate her in any manner.

Mrs. Carr's obligation to Wyrick became only that of a debtor as for damages, upon her failure to perform her sale contract obligation. She did not receive the money in trust, but as her own, in part payment of the contemplated sale of the piano from her to him. Her failure to use the advance payment upon the purchase price she would have to make in procuring the piano was not a misappropriation of Wyrick's money. It was her money in a legal sense. It is elementary law that one cannot steal or embezzle his own money so as to render himself criminally liable therefor.

Our own early decision in *State v. Covert,* 14 Wash. 652, 45 Pac. 304, supports our conclusion that Mrs. Carr was not the agent of Wyrick. Further strong support of this conclusion is found in the following authorities: *Black v. Webb,* 20 Ohio Rep. 304; *State v. Brown,* 171 Mo. 477, 71 S. W. 1031; *Echols v. State,* 158 Ala. 48, 48 South. 347; *Simpson v. People,* 47 Colo. 612, 108 Pac. 169; *State v. White,* 46 Idaho 124, 266 Pac. 415; 1 Mechem on Sales, § 41; 20 C. J. 416; 9 R. C. L. 1269.

The fact that Wyrick made an advance payment to

Mrs. Carr upon the purchase price of the piano, for future delivery, it being understood that she did not then have the piano in stock, is not of itself any proof of an agency relation between them. That is only proof of the executory nature of their contract. Such a sale contract is not unusual, and is not illegal. In the text of 23 R. C. L. 1249, we read:

"While there can be no sale of an article which is not in existence actually or potentially a person may legally enter into an executory contract to sell such article in the future, when it comes into existence; and according to the general view prevailing in this country, such a contract is not void by reason of the fact that at its date the seller does not have the goods, has not entered into any arrangement to buy them, and has no expectation of receiving them, except by going into the market and buying or otherwise acquiring them."

This is not only the common law, but is the statute law under our uniform sales act in Rem. 1927 Sup., § 5836-5; Laws of 1925, Ex. Ses., chapter 142, p. 357, § 5.

The testimony of Mrs. Carr did not affirmatively show the relationship between her and Wyrick as being other than that of seller and buyer. There may be ground for the jury disbelieving some of her testimony given in justification of her not fulfilling her contract. That we regard as of no moment in our present inquiry. If the jury were justified in taking that view of her testimony, it amounted to nothing more than the elimination of that portion of her testimony from the case, and did not furnish any proof of agency relationship between her and Wyrick. See *State v. Williams,* 141 Wash. 165, 251 Pac. 126.

Whatever the civil liability may be resting upon Mrs. Carr in favor of Wyrick by reason of her breach of the sale contract between them, we are of the opinion that

it must be decided, as a matter of law, that there has not been proven any criminal liability resting upon her by reason of her violation of their sale contract.

We have not overlooked our decision upon the former appeal of this case *(State v. Carr,* 160 Wash. 74, 294 Pac. 1013), whereby we reversed the former conviction of Mrs. Carr and awarded her a new trial for errors depriving her of the benefit of a fair trial; but held that the evidence there given against her would be sufficient to sustain her conviction. Her present conviction must stand or fall upon the evidence or want of evidence given against her upon her second trial, which is the one we are here reviewing. That evidence appears to us to be different from the evidence given upon the first trial.

The judgment is reversed, and the cause remanded to the superior court with directions to dismiss the case.

TOLMAN, C. J., MITCHELL, MAIN, and STEINERT, JJ., concur.

HOLCOMB, J. (dissenting)—I am obliged to dissent from the determination of the majority.

After the reversal and remand of the case for retrial, by the decision on the former appeal, 160 Wash. 74, 294 Pac. 1013, the case was retried in the lower court upon the same theories on the part of both the state and appellant, the state contending that the transaction between appellant and Wyrick created the relation of principal and agent between them, and appellant contending that the relation was that of seller and purchaser.

There was competent evidence from which the jury were justified in finding that the relations between appellant and Wyrick were those of principal and agent

and not seller and purchaser, under proper instructions as to how to determine that issue.

The judgment of the trial court should be affirmed.

MILLARD and BEALS, JJ., concur with HOLCOMB, J.