18227

The STATE, Respondent, v. James E. WHITE, Appellant
(137 S. E. (2d) 97)

*Messrs. Clarence E. Clay* and *Robert A. Clay,* of Greenville, *for Appellant,*

*Messrs. B. O. Thomason, Jr., Solicitor,* and *Rex L. Carter,* of Greenville, *for Respondent,*

June 12, 1964.

BUSSEY, Justice.

The defendant-appellant, James E. White, was tried and convicted in the Court of General Sessions of Greenville County on an indictment charging him with breach of trust with fraudulent intent. Specifically, the indictment charged that on or about the 19th day of October, 1961, he willfully and unlawfully committed a breach of trust with a fraudulent intention, being entrusted by George Coleman Motors, a corporation, with the care, keeping and possession of a tractor and dump trailer of the value of $1,400 such being

the property of the said corporation, and that he did willfully, unlawfully and feloniously take and appropriate the said tractor and dump trailer to his own use and purposes with the intention of cheating and defrauding said corporation.

The exceptions are several, but the only issue we think necessary to decide is whether the trial court should have directed a verdict of acquittal on the ground that the evidence was insufficient to prove the charge as set forth in the indictment.

In deciding whether the circuit court was in error in refusing to direct a verdict on that ground, all the testimony must be taken most strongly against the defendant. In reviewing the evidence in that light, the facts are substantially as follows:

George Coleman Motors is a corporation engaged in business as a Ford dealer in Travelers Rest, South Carolina. Its two principal officers are George Coleman, Sr., and George Coleman, Jr. Another corporation referred to in the testimony was either Commercial Body Company or Commercial Body Works, which did business in the vicinity of Greenville and will hereafter be referred to as Commercial. Appellant was a minority stockholder in and general manager of Commercial, which concern had some seventeen or eighteen employees, and was engaged in the building and repairing of automotive bodies and, at least to some extent, the purchase and sale of used equipment. The principal stockholders of Commercial were a Mr. Long, who owned one-half of the capital stock, and a Mr. Lee, who owned somewhat less than one-half. Apparently neither of the principal stockholders in Commercial very actively participated in the operation and management of the corporation until it got into financial difficulties, hereinafter referred to.

Some time during the early part of October, 1961, the motor equipment involved in this case (a GMC tractor and

a Fruehauf trailer) was at Commercial's place of business for the purpose of repair and sale by Commercial, but belonged to a concern in Spartanburg. George Coleman, Jr., went to Commercial for the purpose of appraising the equipment with the idea of working out a trade with the Spartanburg concern, which trade was later effected; the equipment being traded and moved to Coleman Motors in Travelers Rest. Before Coleman traded for the equipment, appellant told Mr. Coleman, Jr., that if he traded for it, he thought that he (White) could sell the equipment for Coleman. It was agreed between the parties that in the event of a sale Coleman would take the wholesale price of $1,400 for the equipment.

On or about October 16, appellant contacted Coleman and advised that he had a prospect for the equipment. Apparently on the same day appellant went to the premises of Coleman, taking with him the sales manager of Commercial, one Alvin Smith; the equipment was then delivered to appellant by Coleman and Smith drove the equipment back to the premises of Commercial. On or about October 19th, appellant called Mr. Coleman, Jr., and told him that he had the tractor and trailer sold and that he would send out and get the bill of sale, title to the tractor and trailer, and send the money for it. Following this conversation, one Frank R. Hughes, employed by Commercial as a delivery and collection man, arrived at Coleman Motors, but took with him no money and, according to the testimony of Mr. Coleman, Jr., said that appellant had to have the numbers on the truck so that he could get his money out of the trailer and truck, as a result of which Coleman gave to Hughes a bill of sale, for the equipment, made out in favor of Commercial, but told Hughes that he was holding the certificate of title until he got the $1,400.00, which was the agreed price to Coleman upon a sale by appellant.

Appellant testified that when he and Smith got the equipment, on or about October 16th, it was gotten for the purpose of showing the same to a prospect in Greenwood, South

Carolina, but no sale was effected and the equipment was returned to Coleman. He further testified that the equipment was later gotten again from Coleman, and that on the latter occasion, although he knew of it, he did not personally participate in the transfer of the equipment from the premises of Coleman to the premises of Commercial. Mr. Coleman, Jr., queried about this did not deny that the equipment had been removed from the premises of Coleman on more than one occasion, saying only that he did not remember it. The State's witness, Mr. Alvin Smith, was not specifically queried thereabout. In any event, on or about October 27th, the equipment in question was sold under an arrangement made by Mr. Alvin Smith, sales manager of Commercial, through a Mr. Garrett, a GMC dealer in Thompson, Georgia, with whom Smith had had previous contacts, to Storey Trucking Company of that area of Georgia. Mr. Garrett and Mr. Storey flew to Greenville in a private plane for the purpose of concluding the transaction, all of which was handled by Smith, although it is clear that appellant had knowledge of the transaction. The price to Storey was $2,200.00, with a $200.00 commission being paid to Garrett, and apparently a $2,000.00 check being made to Commercial. The records of Commercial show that on October 27th a receipt for the sum of $2,000.00 was issued in favor of Storey by Commercial, the receipt being signed by one Linda Keller, a girl who worked in the office of Commercial. Mr. Smith testified that he personally handed the check from Storey payable to Commercial to the appellant, which, according to Smith, was standard procedure.

The record simply does not disclose what thereafter happened to the check. Commercial at the time was actually insolvent and later went into receivership, closing its doors for business on November 11, 1961. An auditor employed to go over the books of Commercial testified that he could find no record of that particular check having been deposited in the account of Commercial, but no effort was made by the State to prove, through either the maker of

the check or the bank on which it was drawn, the ultimate course which the check traveled.

The affairs of the corporation were considerably involved and, among other things, Mr. Lee, the second largest stockholder, during the month of October, 1961, took possession of some $5,000.00 of customers' checks payable to Commercial, to reimburse, or to protect himself in connection with obligations of Commercial for which he presumably was personally liable. There was testimony for the State that Mr. Lee got no checks after about October 16th. Whether Mr. Lee got more than $5,000.00 in checks payable to Commercial or got any amount subsequent to October 16th was in issue. Mr. Lee was deceased at the time of trial and his daughter, who participated to some extent in the transactions, was not called as a witness.

Not having received the sum of $1,400.00 from either appellant or Commercial, as expected subsequent to the delivery of the bill of sale, Coleman contacted appellant thereabout and, on or about November 2, appellant gave Coleman a check of Commercial for that amount, signed by appellant in his official capacity, which check, however, was not paid by the bank for lack of sufficient funds. Coleman made efforts not only to collect the check, but to recover possession of the equipment itself in Georgia, but was unsuccessful therein due to the fact that Georgia does not have a motor vehicle title certificate law.

In brief, the contention of the appellant here is that if the evidence is sufficient to prove a breach of trust as to anything, which is denied, it would prove a breach of trust with fraudulent intention as to the proceeds of the sale and not as to the equipment itself. Hence, it is urged that the case of *State v. Cody*, 180 S. C. 417, 186 S. E. 165, is here controlling and we think this contention is sound.

We are not called upon to express an opinion as to the sufficiency of the evidence to sustain a charge of breach of trust with a fraudulent intention with respect to the portion

of the proceeds of the sale of the equipment which rightfully belonged to Coleman. We, hence, intimate no opinion thereabout, but even if the evidence be deemed sufficient for such purpose, as was said in *State v. Cody, supra:*

"We think no authority can be found which holds that the charge of breach of trust with fraudulent intention relating to the unlawful conversion of mill stock is sustained by proof of a breach of trust with a fraudulent intention relating to the subsequent conversion of money, the proceeds derived from the sale of stock.

"In all criminal prosecutions, the defendant has a constitutional right to be informed of the accusation against him; and it is a rule of universal observance in administering the criminal law that a defendant must be convicted, if convicted at all, of the particular offense charged in the bill of indictment. It would be contrary to all rules of procedure, and violative of his constitutional right, to charge him with the commission of one crime and convict him of another and very different one. He is entitled to be informed of the accusation against him, and to be tried accordingly. *State v. Harbert,* 185 N. C. 760, 118 S. E. 6.

"The state must prove the exact trust which has been breached. * * *"

Here the testimony tends to establish that the trust which the defendant breached and violated, if any, was the obligation to remit the sum of $1,400.00 to Coleman from the proceeds of the sale of the equipment. The indictment, on the other hand, alleges the trust which he breached was the obligation to hold the equipment and that instead of doing so, he fraudulently appropriated the equipment to his own use. It seems clear to us that these are two separate and distinct offenses; that they are not the same in law or fact, and involved different acts of wrongdoing. Evidence tending to prove one does not prove the other or warrant a conviction therefor.

The fact that Coleman retained the title certificate as protection to Coleman does not, we think, alter the case.

The apparent purpose of retaining the title certificate was twofold; (1) to assure the return of the equipment if a sale was not effected; (2) to assure the payment of $1,400.00 if a sale was effected. It is clear that Coleman entrusted not only the equipment, but the bill of sale for the equipment, to the appellant for the very purpose which was accomplished, the sale of the equipment. For the purpose of the only issue before us, it is immaterial whether the same was entrusted to appellant personally or was entrusted to Commercial. The only thing Coleman was looking to either the appellant or Commercial for was the $1,400.00 which rightfully belonged to Coleman and which Coleman did not receive. To quote further from *State v. Cody, supra:*

"The rule is announced in 20 C. J. 431, that, 'where an agent with authority to sell property in his possession, does sell it as such agent, a subsequent conversion of the proceeds of the sale is an embezzlement of such proceeds, and not of the property sold. And this has been held to be the rule, even where the agent sells the property with the intent fraudulently to convert the proceeds.'

"And we believe that this quotation correctly expresses the general law."

For the foregoing reasons, we are of the opinion that the circuit judge should have directed a verdict of acquittal. Hence, the judgment of the lower court is reversed and the cause remanded for entry of judgment accordingly.

Reversed and remanded.

TAYLOR, C. J., and MOSS, LEWIS and BRAILSFORD, JJ., concur.