578 S.E.2d 736

**The STATE, Respondent,**

v.

**Marion L. PARRIS, Appellant.**

**No. 3607.**

Court of Appeals of South Carolina.

Heard Nov. 11, 2002.

Decided March 10, 2003.

Rehearing Denied April 18, 2003.

584

Assistant Appellate Defender Robert M. Dudek, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Charles H. Richardson, and Assistant Attorney General W. Rutledge Martin, all of Columbia; and Solicitor Harold W. Gowdy, III, of Spartanburg, for Respondent.

SHULER, J.:

Marion L. Parris appeals his conviction for breach of trust with fraudulent intent, arguing the trial court erred in failing to grant his motion for a directed verdict. We agree and reverse.

## FACTS/PROCEDURAL HISTORY

Marion Parris owned and operated Parris Home Sales (PHS), a mobile home dealership in Gaffney. PHS had a

financing arrangement with First National Bank which included a $750,000 "floor plan" line of credit for the pre-approved purchase of mobile homes. As security, First National had a blanket lien over all PHS business assets. In addition, although titles [1] to the mobile homes in the company's inventory originated in PHS, First National maintained physical possession of all titles until each unit was sold. Upon receipt of payment for its interest, First National transferred possession of the title to either the buyer, if the transaction was a cash sale, or, as was usually the case, the permanent lender financing the purchase.

On February 3, 1999, PHS executed a note to First National for $37,405 to purchase a new double-wide mobile home. The loan agreement authorized PHS to pay only accrued interest, in monthly installments, until February 5, 2000, at which time the entire principal amount would come due. The agreement further provided, in part, that PHS would be in default if it did or failed to do something causing the bank to believe it would have difficulty collecting the amount owed. In case of default, the agreement outlined four enumerated remedies plus "any remedy ... under state or federal law."

On November 1, 1999, Jerry and Sherry Martin signed a purchase agreement for the mobile home bought by PHS with proceeds from the February 3rd loan. The contract listed a purchase price of $40,340 and stated in pertinent part:

Title to said [mobile home] shall remain in the Seller until the agreed purchase price therefor [sic] is paid in full ☐ in cash or by the execution of a ☐ Retail Installment Contract, or a Security Agreement and its acceptance by a financing agency; thereupon title to the within described unit passes to the buyer as of the date of either full cash payment or on the signing of said credit instruments even though the actual physical delivery may not be made until a later date.

The sale was consummated on November 18, 1999, when the Martins' lender, Bank of America, issued two checks totaling $40,340 and jointly payable to Jerry Martin and PHS. Pursuant to the terms of the purchase agreement, title to the mobile home passed to the Martins at this time, albeit subject to First

---

1. Officially known as the "Manufacturer's Statement or Certificate of Origin to a Mobile Home."

National's outstanding lien. Jerry Martin thereafter endorsed the checks and Marcia Jolly, the bank vice president conducting the loan closing, handed them to Parris. Parris told the Martins to "give him a couple of days and he would have everything done and [they] could be moved in by Thanksgiving," then left the bank. The Martins subsequently accepted delivery and took possession of the mobile home on the day before Thanksgiving.

The next day, November 19, Parris opened a checking account with American Federal Bank and deposited the two checks from Bank of America. Thereafter, he withdrew money and wrote checks on the account to himself, PHS, and various other payees; he also deposited an additional $7,858.29 into the account.

On December 6, Sherry Martin noticed First National's president, Steve Moss, "snooping" around the new mobile home. Moss approached, knocked on the door, and asked Martin for the trailer's serial number. When Martin told Moss the number was none of his business, Moss replied "that he had a right to get the serial number, that he owned the home, and that he could repossess it." Sherry Martin, upset and crying, called her husband and told him what Moss had said.

Jerry Martin immediately drove to First National and discussed the matter with Thomas Hale, the bank's Chief Lending Officer. Hale explained that First National still had the title to the trailer because Parris had not yet paid off the note. When Martin asked if the bank could really take possession of the home, he was told it could and "probably would." Hale then directed Martin to hire a lawyer and go to the police. The Martins did so and the police subsequently arrested and charged Parris with breach of trust with fraudulent intent. Following the arrest, First National accelerated the underlying note and seized PHS's business assets, which it later sold at a discount.

On February 24, 2000, a Cherokee County grand jury indicted Parris for breach of trust with fraudulent intent. Following conviction by a jury on July 25, 2000, the trial court sentenced Parris to ten years imprisonment. This appeal followed.

## LAW/ANALYSIS

### Standard of Review

■ In ruling on a motion for directed verdict in a criminal case, a trial court must view the evidence in the light most favorable to the State. *See State v. Buckmon,* 347 S.C. 316, 555 S.E.2d 402 (2001). In so doing, the court is concerned with the existence of evidence, not its weight. *State v. Lollis,* 343 S.C. 580, 541 S.E.2d 254 (2001). This Court, in reviewing a refusal to grant the motion, must also view the evidence in a light most favorable to the State. *State v. McGowan,* 347 S.C. 618, 557 S.E.2d 657 (2001). If the record reveals any direct or substantial circumstantial evidence which reasonably tends to prove guilt, then this Court must find the trial court acted properly in submitting the case to the jury. *See Buckmon,* 347 S.C. at 321, 555 S.E.2d at 404; *Lollis,* 343 S.C. at 584, 541 S.E.2d at 256.

■ On the other hand, if the State fails to present sufficient evidence of the offense, a defendant is entitled to a directed verdict from the court. *State v. Walker,* 349 S.C. 49, 562 S.E.2d 313 (2002). Hence, "where the facts of the case, even if proved, do not constitute the alleged criminal conduct, a directed verdict must be granted." *State v. Jackson,* 338 S.C. 565, 569, 527 S.E.2d 367, 369 (Ct.App.2000).

### Discussion

Parris argues the trial court erred in failing to direct a verdict because the State failed to prove he committed a breach of trust. We agree.

■ Although our Legislature has partially codified the offense of breach of trust with fraudulent intent, its elements remain defined by case law. *See* S.C.Code Ann. § 16–13–230 (Supp.2002). In essence, the crime is "larceny after trust, which includes all of the elements of larceny or in common parlance, stealing, except the unlawful taking in the beginning." *State v. Scott,* 330 S.C. 125, 130, 497 S.E.2d 735, 738 (1998) (quoting *State v. Owings,* 205 S.C. 314, 316, 31 S.E.2d 906, 907 (1944)). The fact distinguishing larceny from breach of trust is that possession of the property is gained by unlawful means in larceny while a breach of trust is accom-

plished by a lawful taking of the property, i.e., through its *entrustment* to one by another.[2] *See Scott,* 330 S.C. at 130, 497 S.E.2d at 738.

■ To sustain a conviction, the State must prove every element of the offense charged. *Jackson,* 338 S.C. at 569, 527 S.E.2d at 369. In breach of trust cases, the central question is whether the defendant *"received the property in trust,"* which he later violated. *Jackson,* 338 S.C. at 569, 527 S.E.2d at 369 (quoting *State v. Shirer,* 20 S.C. 392, 408 (1884)). The State, therefore, is required to establish the existence of a trust relationship, and in the absence thereof the defendant is entitled to a directed verdict of acquittal. *Id.* at 569–570, 527 S.E.2d at 370; *see State v. LeMaster,* 231 S.C. 321, 98 S.E.2d 756 (1957).

■ A trust is an arrangement whereby property is transferred to another with the intent that it be administered by the trustee for the benefit of the transferor or a third party. *See Jackson,* 338 S.C. at 570, 527 S.E.2d at 370. As such, it is "a fiduciary relationship . . . *which arises as a result of a manifestation of an intention to create it." Restatement (Second) of Trusts* § 2 (1959) (emphasis added). In most instances a trust relationship is created by the express intent to do so, either through words or conduct. *Id.* at § 24.

The instant indictment for breach of trust alleged Jerry Martin "entrusted" Parris with $40,340, which Parris later

---

2.  South Carolina is apparently the only jurisdiction to refer to this offense as breach of trust, as our supreme court has noted:

> Breach of trust with fraudulent intention, by that especial designation, is, so far as we are advised, peculiar to this jurisdiction. In other states, the crime, as known to us, is called by different names, such as "larceny after trust," "larceny by a bailee," "larceny by false pretenses," and very commonly as "embezzlement." . . . The general purpose running through the statutes creating and defining these crimes is, however, the same; to declare as a crime, and usually as one coming within the classification of larceny, acts which were formerly not deemed to be larceny at common law, because of the fact that possession of property had been obtained through the consent of the owner.

*State v. McCann,* 167 S.C. 393, 400, 166 S.E. 411, 414 (1932). Because breach of trust is "so similar in its aspects to embezzlement, as the latter crime is defined and regarded in most American jurisdictions," *see id.,* we will utilize the reasoning employed in extra-jurisdictional case law, as did the court in McCann, to support our analysis herein.

appropriated for his own use. The mere assertion of a trust relationship, however, is not proof of its existence—the State must present evidence tending to prove the relationship as an element of the crime. Although the indictment failed to specify the nature of the alleged trust, the State's theory of the case, acknowledged in its brief, was that Martin "entrusted" Parris with the two checks in exchange for clear title to the mobile home.

In support of this theory, the State offered testimony from Jerry Martin that he "expected" Bank of America to get a clear title to the home when Parris received the checks. The State further relied on Sherry Martin's testimony that she "expected" Parris's statement at closing was accurate—that "he would have everything done" in a couple of days so that they could move in by Thanksgiving. According to the State, the Martins' testimony reflects a "common understanding" as to when Parris would deliver the checks to First National. We disagree. In our view, the proffered evidence, ambiguous at best, is insufficient to support a finding of a specific trust agreement. *See Jackson,* 338 S.C. at 571, 527 S.E.2d at 371 ("Absent the manifest intent to create a trust, there could be no trust or trust relationship to breach."); *State v. White,* 244 S.C. 349, 355, 137 S.E.2d 97, 99 (1964) (" 'The [S]tate must prove the exact trust which has been breached ....' ") (quoting *State v. Cody,* 180 S.C. 417, 424, 186 S.E. 165, 167 (1936)); *Nickles v. State,* 89 Ga.App. 538, 80 S.E.2d 97, 101 (1954) (To maintain a conviction for larceny after trust, "[t]here must have been a contract [or] understanding between the defendant and the victim whereby the former received the money from the latter *with the distinct agreement and understanding that he would apply the same to a particular use for the benefit of the [victim]."*) (emphasis added).

Although Parris ultimately failed to deliver good title, perhaps warranting a claim for breach of contract, nothing in the record indicates Martin entrusted him with the purchase price for the express purpose of paying off First National to obtain clear title to the trailer. To the contrary, the record reveals Martin was unaware title was held by anyone other than Parris until December 6, 1999, and thus could not have intended to create a trust when Parris received the checks on

November 18.[3]  We therefore find the State did not prove a trust relationship in this manner.  *See LeMaster,* 231 S.C. at 323–24, 98 S.E.2d at 757 (reversing breach of trust convictions where evidence showed builders informed clients $2,000 was needed to pay for materials, "specifically some $600 owing to one M.D. Martin," and thereafter received the requested funds but failed to pay Martin; the court rejected the State's argument that the $2,000 payment "was impressed with a special trust," finding no evidence of a trust relationship between the builders and clients in part because the Martin bill was not rendered to builders until seven days after they were handed the $2,000 check); *Teston v. State,* 194 Ga.App. 324, 390 S.E.2d 437, 439 (1990) (finding evidence insufficient to establish trust relationship where residential builder allegedly used proceeds of construction loan for purposes other than building specific house; court stated nothing in loan documents or trial testimony "provided that the funds were to be used *only* for" a particular house).  *Compare Nickles,* 80 S.E.2d at 101 (reversing conviction for larceny after trust because there was no evidence defendant was entrusted with money for a particular purpose) *with State v. Joy,* 121 Wash.2d 333, 851 P.2d 654, 659 (1993) (stating embezzlement conviction may be valid when an agreement between the parties restricts the use of funds to a specific purpose, since the party giving the funds has "an interest in the . . . application of the money to the purpose for which it was entrusted to defendant").[4]

---

**3.**  Both checks also contained identical endorsement language:
> For value received, by endorsement, the payee does warrant good title to and full right to convey a 1999 Legend Mobile Home serial # THL2936ABAL.  [And at the] time of such sale and application of certificate of title thereto, payee has shown a lien in favor of Bank of America. . . .

By endorsing the checks, PHS and Jerry Martin recognized Bank of America's interest in the mobile home as well as their right and ability to convey good title.  From this evidence it is apparent neither Martin nor Bank of America realized First National had a priority lien on the home; had Bank of America been aware of First National's interest, it likely would have written the checks as jointly payable to Parris and First National rather than Martin.  Although Parris perhaps would be amenable to a charge of selling property encumbered by a lien, see S.C.Code Ann. § 29–1–30 (1991), the evidence supports his innocence of breach of trust.

**4.**  It is instructive to compare the facts of this case with those where the State properly obtained a conviction for breach of trust based on a

A trust, however, may arise by implication in the absence of an express common intent if there is a fiduciary relationship between the parties, because "[a] person in a fiduciary relation to another is under a duty to act for the benefit of the other as to matters within the scope of the relation." *Restatement* at § 24.[5] Accordingly, an implied trust may be proved by evidence tending to show the parties' relationship was fiduciary.

The ordinary relationship between unaffiliated parties is not fiduciary. *Restatement* at § 2. A fiduciary relationship may be created, however, when "one reposes special confidence in another so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence." *SSI Med. Servs., Inc. v. Cox,* 301 S.C. 493, 500, 392 S.E.2d 789, 794 (1990); *see Steele v. Victory Sav. Bank,* 295 S.C. 290, 293, 368 S.E.2d 91, 93 (Ct.App.1988) ("A 'fiduciary relationship' is founded on trust and confidence reposed by one person in the integrity and fidelity of another."). In general, "mere respect for another's judgment or trust in his character is usually not sufficient to establish such a relationship." *Burwell v. S.C. Nat'l Bank,* 288 S.C. 34, 41, 340 S.E.2d 786, 790 (1986). Because a fiduciary relationship is based on the trust and confidence reposed by one in the integrity and fidelity of

specific trust, to wit: *State v. Jordan,* 255 S.C. 86, 90–91, 177 S.E.2d 464, 467 (1970) (upholding stockbroker's conviction where he "divert[ed] money received in trust *for the purchase of [certain] stock"* to personal use rather than applying it "in compliance with the trust") (emphasis added); *State v. McCann,* 167 S.C. 393, 166 S.E. 411 (1932) (affirming conviction where daughter-in-law endorsed and gave check to father-in-law with instructions to "pay the doctor's bill, the drug bill and the funeral bill and bring the rest back," and father-in-law, in addition to paying the debts as instructed also used part of the proceeds to pay his own grocery bill); *State v. Barber,* 90 S.C. 565, 73 S.E. 771 (1912) (sustaining conviction of bail bondsman where client's wife entrusted him with $100 *for the purpose of paying a commuted fine* owed by her husband and he instead appropriated the money for his own use) (emphasis added).

5. Indeed, some relationships are deemed fiduciary as a matter of law. *See, e.g., State v. Ezzard,* 40 S.C. 312, 18 S.E. 1025 (1894) (principal-agent relationship); *State v. Scott,* 330 S.C. 125, 497 S.E.2d 735 (Ct.App.1998) (employer-employee relationship); *State v. Johnson,* 314 S.C. 161, 442 S.E.2d 191 (Ct.App.1994) (foundation-trustee relationship).

another, the relationship between the parties must be more than casual. *Steele*, 295 S.C. at 293, 368 S.E.2d at 93.

To establish the existence of a fiduciary relationship, the facts and circumstances must indicate the party reposing trust in another has some foundation for believing the one so entrusted will act not in his own behalf but in the interest of the party so reposing. *Burwell*, 288 S.C. at 41, 340 S.E.2d at 790. Moreover, the evidence must show the entrusted party " 'actually accepted or induced the confidence placed in him.' " *Brown v. Pearson*, 326 S.C. 409, 423, 483 S.E.2d 477, 484 (Ct.App.1997) (citation omitted). This is because "as a general rule, a fiduciary relationship cannot be established by the unilateral action of one party." *Steele*, 295 S.C. at 295, 368 S.E.2d at 94; *see Arnold v. Erkmann*, 934 S.W.2d 621, 630 (Mo.Ct.App.1996) ("A 'fiduciary duty is not created by a unilateral decision to repose trust and confidence; it derives from the conduct or undertaking of the purported fiduciary.' ") (citation omitted); *Furr's Inc. v. United Specialty Adver. Co.*, 385 S.W.2d 456, 459–60 (Tex.Civ.App.1964) (finding no confidential relationship existed where buyer failed to present evidence seller was aware of confidence buyer claimed to have reposed in him since a "[c]onfidential relationship is a two[-]way street").

Although it appears no South Carolina case has addressed the issue, a wealth of foreign case law describes the commercial relationship between a buyer and seller as ordinarily not fiduciary. *See, e.g., Comm. on Children's Television, Inc., v. Gen. Foods Corp.*, 35 Cal.3d 197, 197 Cal.Rptr. 783, 673 P.2d 660, 676 (1983) ("The relationship of seller to buyer is not one ordinarily vested with fiduciary obligation. . . . A fiduciary, by contrast, assumes duties beyond those of mere fairness and honesty . . . he must undertake to act on behalf of the beneficiary, giving priority to the best interest of the beneficiary."); *Mabry v. Pelton*, 208 Ga.App. 891, 432 S.E.2d 588, 590 (1993) (" 'The vendor and vendee of property are not, by virtue of such fact, placed in a confidential relationship to each other, but on the contrary are presumed to be dealing at arm's length.' ") (citation omitted); *Arnold*, 934 S.W.2d at 629 ("A buyer who pays the purchase price to a seller for a specific item or contract right is not 'entrusting' the seller with sums of money for 'investment' so as to create a fiduciary relation-

ship."); *Am. Driver Serv., Inc. v. Truck Ins. Exch.*, 10 Neb. App. 318, 631 N.W.2d 140, 145, 148 (App.) (finding no fiduciary duty inhered in arm's-length transaction of buyer and seller despite fact sellers generally have greater expertise and superior bargaining power while buyers typically rely on their representations); *Hampton Tree Farms, Inc. v. Jewett*, 320 Or. 599, 892 P.2d 683 (1995) (finding no fiduciary relationship between contracting parties based solely on their agreement to buy and sell logs); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176–77 (Tex.1997) ("[N]ot every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship.... [T]he fact that the parties to a transaction trust one another will not, in and of itself, establish a finding of a confidential relationship.") (internal citations omitted).

The testimonial and documentary evidence offered by the State reveals a quintessential buyer-seller relationship between Marion Parris and Jerry Martin. Nothing in the record indicates Martin reposed a special trust or confidence in Parris such that he had a duty to act only in Martin's interest as fiduciary. Instead, the evidence is susceptible of only one inference—that the receipt of the checks by Parris was part of an arm's-length transaction for the purchase of the mobile home; as such, it cannot serve as the basis of a conviction for breach of trust. *See Huff v. State*, 79 Ga.App. 717, 54 S.E.2d 446, 447 (1949) (reversing conviction for larceny after trust where defendant failed to deliver purchased tombstone, court held evidence showed "money was *paid* to [defendant] not *intrusted* to him") (emphasis added); *People v. Becker*, 414 Ill. 291, 111 N.E.2d 491, 498 (1953) (reversing conviction of seller because evidence of "a transaction which leads only to the debtor[/]creditor relationship will not support a charge of embezzlement"); *State v. Hardin*, 627 S.W.2d 908, 911 (Mo.Ct.App.1982) ("The breach of a contractual duty does not amount to embezzlement...."); *People v. Wrieden*, 299 N.Y. 425, 87 N.E.2d 440, 442 (N.Y.1949) (reversing embezzlement conviction where testimonial evidence revealed transaction "was a purchase and sale [which] completely refutes the charge that defendant occupied a position of trust"); *State v. Carr*, 169 Wash. 56, 13 P.2d 497, 500 (1932) (reversing conviction for embezzlement where dealer accepted $500 down pay-

ment but failed either to deliver the piano contracted for or refund buyer's deposit; court concluded relationship between parties was that of seller and buyer and dealer's obligation "became only that of a debtor for damages").

While this Court does not condone Parris's actions, "[t]he object of the breach of trust act ... was not to make criminal the failure to pay a debt." *State v. Butler*, 21 S.C. 353, 356 (1884). There is no question but that Parris's failure to deliver good title rightfully would subject him to an action for breach of contract. However, where the seller of an item does not receive the money in question in trust but as payment for the item sold, the failure to use the money in a manner beneficial to the buyer does not constitute a misappropriation of the buyer's money. To the contrary, the money once given over legally belongs to the seller, and it is elementary that "one cannot steal or embezzle his own money so as to render himself criminally liable therefor." *Carr*, 13 P.2d at 500. As the Missouri Court of Appeals has stated: "[A] complaining witness ha[s] no right to invoke criminal process on account of the trouble and expense a civil suit might cause him. 'The criminal courts are neither a collection agency nor a forum for the trial of mere disputes over the ownership of property.'" *State v. Morris*, 699 S.W.2d 33, 36 (Mo.Ct.App. 1985) (citation omitted).

The evidence presented in this case fails to show the existence of a fiduciary relationship between Parris and Jerry Martin. Instead, it merely evinces a typical buyer-seller relationship between the parties, a relationship not ordinarily fiduciary in nature. Absent the manifest intent to create a trust or evidence establishing the existence of a fiduciary relationship from which one might be implied, the State presented no proof of a trust that was subject to breach. Because the State failed to meet its burden of proving the existence of a trust relationship, the trial court erred in failing to direct a verdict of acquittal on the charge. *See LeMaster*, 231 S.C. at 324, 98 S.E.2d at 757; *Jackson*, 338 S.C. at 571–72, 527 S.E.2d at 371.

**REVERSED.**

GOOLSBY and HUFF, JJ., concur.