611 S.E.2d 501

**The STATE, Petitioner,**

v.

**Marion L. PARRIS, Respondent.**

**No. 25965.**

Supreme Court of South Carolina.

Heard Feb. 2, 2005.
Decided April 4, 2005.

478

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Charles H. Richardson, Assistant Attorney General W. Rutledge Martin, all of Columbia; Harold W. Gowdy, III, of Spartanburg; and Solicitor Harold W. Gowdy, III, of Spartanburg, for Petitioner.

Assistant Appellate Defender Robert M. Dudek, of Columbia, for Respondent.

Justice WALLER.

We granted a writ of certiorari to review *State v. Parris*, 353 S.C. 582, 578 S.E.2d 736 (Ct.App.2003), in which the Court of Appeals held Respondent, Marion L. Parris, was entitled to a directed verdict on the charge of breach of trust with fraudulent intent. We reverse.

## FACTS

Parris was the owner of Parris Home Sales (PHS), which sold mobile homes in Gaffney. The mobile homes he sold to third parties were financed by a $750,000 floor plan line of credit from First National Bank (FNB) of the Carolinas. FNB held title to the mobile homes until such time as the person who purchased each mobile home obtained financing, and FNB's lien was paid off.

On February 3, 1999, in order to finance the purchase of a double-wide mobile home, serial numbers THL2936AAL and THL2936 BAL, PHS executed a note to First National Bank for $37,405. The note required PHS to pay monthly interest on the outstanding balance of the loan until February 5, 2000, at which time the full balance was due.

On November 1, 1999, Jerry and Sherry Martin signed a purchase agreement to buy the above mobile home (serial numbers THL2936AAL and THL2936 BAL) for $40,340. The contract provided that title to the mobile home would remain in Seller until the purchase price was paid in full and that

"thereupon, title to the within described unit passes to the buyer as of the date of ... full cash payment ... even though the actual physical delivery may not be made until a later date." (emphasis supplied).

The Martins obtained financing for their mobile home from Bank of America, and the loan was closed on November 18, 1999. Bank of America issued two checks totaling $40,340 which were jointly payable to Jerry Martin and Parris Home Sales. Martin endorsed the checks and gave them to Parris. Parris signed an endorsement on the back of the checks, as follows, "for value received, by endorsement, the payee does warrant good title to and full right to convey a 1999 Legend Mobile Home." After endorsing the checks, Parris took them and opened a checking account at American Federal Bank. Thereafter, he wrote checks to himself and others, but not FNB, totaling nearly $40,000.

On December 6, 1999, Sherry Martin was in her new mobile home (which had been delivered around Thanksgiving) when she saw the president of FNB, Steve Moss, walking around her property. When he knocked on the door and asked her for the serial number, she told him it was none of his business, at which time he told her that it was his business as he owned the home and could repossess it. The Martins went to the bank to speak to Moss, who told them to go to a lawyer and to police.

Parris was subsequently arrested and charged with breach of trust with fraudulent intent. FNB accelerated the underlying note; PHS' assets were seized and sold by FNB.[1] A jury convicted Parris of breach of trust with fraudulent intent; he was sentenced to ten years. The Court of Appeals reversed his conviction, finding the State failed to prove the existence of a trust relationship. Accordingly, it found Parris should have been granted a directed verdict. *State v. Parris,* 353 S.C. 582, 578 S.E.2d 736 (Ct.App.2003).

## ISSUE

Was there evidence of a trust relationship to support submission of the offense of breach of trust with fraudulent intent to the jury?

---

1. FNB took the money owed from the sale of Parris' property and ultimately gave the Martins title to the mobile home.

## STANDARD OF REVIEW/LAW

 A defendant is entitled to a directed verdict when the State fails to produce evidence of the offense charged. In reviewing a motion for directed verdict, the trial judge is concerned with the existence of the evidence, not with its weight. On appeal from the denial of a directed verdict, an appellate court must view the evidence in the light most favorable to the State. If there is any direct evidence or substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the Court must find the case was properly submitted to the jury. *State v. Curtis,* 356 S.C. 622, 591 S.E.2d 600 (2004).

The elements of breach of trust with fraudulent intent are not set forth in S.C.Code Ann. § 16–13–230 (1985). However, in *State v. McCann,* 167 S.C. 393, 400, 166 S.E. 411, 414 (1932), we recognized that breach of trust with fraudulent intent is peculiar to this jurisdiction, stating:

> In other states, the crime, as known to us, is called by different names, such as "larceny after trust," "larceny by a bailee," "larceny by false pretenses," and very commonly as "embezzlement." All the offenses are regarded as statutory, and one must look to the respective statutes to ascertain a definition of the crime. In text-books, law encyclopedias, and digests, references to decisions concerning these offenses are usually found under the title or subject of "embezzlement." The general purpose running through the statutes creating and defining these crimes is, however, the same; to declare as a crime, and usually as one coming within the classification of larceny, acts which were formerly not deemed to be larceny at common law, because of the fact that possession of property had been obtained through the consent of the owner.

*See also State v. Owings,* 205 S.C. 314, 316, 31 S.E.2d 906, 907 (1944) (defined the offense as "larceny after trust, which includes all of the elements of larceny or in common parlance, stealing, except the unlawful taking in the beginning"); *State v. Scott,* 330 S.C. 125, 130, 497 S.E.2d 735, 738 (Ct.App.1998) ("[t]he primary difference between larceny and breach of trust is that in common-law larceny, possession of the property

stolen is obtained unlawfully, while in breach of trust, the possession is obtained lawfully").

In *State v. Shirer*, 20 S.C. 392, 408 (1884), the Court stated, "the object of our [breach of trust] act was simply to enlarge the field of larceny, removing what before might have been a defense for those who received property in trust and afterwards fraudulently appropriated it. The question under our act is, whether the party received the property in trust, which he afterwards violated. . . ." Therefore, the State must prove the existence of a trust relationship to sustain a charge of breach of trust with fraudulent intent. *See State v. LeMaster*, 231 S.C. 321, 98 S.E.2d 756 (1957). Failure to prove the existence of a trust relationship will result in a directed verdict of acquittal for the defendant. *Id.*

A trust is an "arrangement whereby property is transferred with intention that it be administered by trustee for another's benefit." *State v. Jackson*, 338 S.C. 565, 527 S.E.2d 367 (Ct.App.2000), *citing Black's Law Dictionary* 1047 (6th Ed.1991). Thus, the transferor of the property must intend that the trustee will act for the transferor's benefit instead of on his own behalf. *Id. See State v. McCann*, 167 S.C. 393 166 S.E. 411 (1932).

## DISCUSSION

Essentially, the Court of Appeals held that because there is no testimony in the record from the Martins themselves that they gave the money to Parris with the specific instruction that he pay off the FNB lien, there is no evidence that a trust relationship was formed, such that Parris was entitled to a directed verdict. This was error. We find sufficient evidence in the record from which the jury could have inferred a trust relationship.

The State's first witness, FNB's chief lending officer Thomas Hale, testified as to the floor plan under which the mobile homes were financed. He testified that FNB was owed $37,405 on the mobile home, and that before anyone could take clear title of that home, FNB would have to be paid that amount. He testified that "normally, the new owner would obtain financing or pay cash . . . and arrangements would be made with the seller, Mr. Parris, and the bank . . . to pay off

the lien that existed on the mobile home." Paula Griggs, who worked for PHS and was responsible for bringing the Martins in as customers, testified that she knew FNB had a lien on the mobile home, and that when she told Parris that he needed to pay off FNB's lien on the Martin's home, Parris told her he would take care of it. She testified that in the normal course of PHS' business, the checks that came in would be deposited and then the payments would be made against the liens.

Marcia Jolly, a vice-president of Bank of America, testified that, at the closing, Martin endorsed the checks, and then she handed them to Parris. Thereafter, Parris endorsed the checks, with the following language, "for value received, by endorsement, the payee does warrant good title to and full right to convey a 1999 Legend Mobile Home." Deborah Ellis, PHS' secretary/office manager, testified that she never received the Bank of America check to go to FNB and that she was told that Parris said "he would take care of it." James Parker, sales manager for PHS, testified that whenever a mobile home was sold, Marion Parris was responsible for making sure FNB was paid.

Jerry Martin testified that when he gave Parris the $40,340 check, he expected his bank would get a clear title. Sherry Martin testified that, as far as she knew, her mobile home had been paid for with the checks from Bank of America, and she did not learn otherwise until Mr. Moss (from FNB) came to the home and told her otherwise on December 6, 1999.

In *State v. Jackson*, 338 S.C. 565, 570, 527 S.E.2d 367, 370 (Ct.App.2000), the Court of Appeals stated:

> [a] trust is an "arrangement whereby property is transferred with intention that it be administered by trustee for another's benefit." *Black's Law Dictionary* 1047 (6th Ed.1991). Thus, the transferor of the property must intend that the trustee will act for the transferor's benefit instead of on his own behalf.

Clearly, the Martins here entrusted their checks to Parris with the intent they be used for their benefit, rather than for Parris' own benefit. Accordingly, we find the evidence presented, taken in the light most favorable to the State, was

sufficient to present a jury issue as to the creation of a trust relationship. The Court of Appeals' opinion is reversed.

**REVERSED.**

TOAL, C.J., MOORE and BURNETT, JJ., concur.
PLEICONES, J., concurring in a separate opinion.

Justice PLEICONES.

I agree that the Court of Appeals' decision should be reversed, but I respectfully disagree with the majority's rationale. In my opinion, breach of a "trust," as that term is traditionally understood, is not essential to a conviction for breach of trust with fraudulent intent. Rather, the trust that must be breached for the crime to be complete is that confidence reposed by the victim in the recipient of the property.

Breach of trust with fraudulent intent "is nothing more or less than larceny. It might well be termed statutory larceny, as distinguished from larceny at common law. The main distinction between the two crimes is this: In common-law larceny, possession of the property stolen is obtained *unlawfully,* while in breach of trust, the possession is obtained *lawfully.*" *State v. McCann,* 167 S.C. 393, 397–98, 166 S.E. 411, 413 (1932) (emphasis in original). "[T]he object of [breach of trust with fraudulent intent] was simply to enlarge the field of larceny, removing what before might have been a defense for those who received property in trust and afterwards fraudulently appropriated it." *State v. Shirer,* 20 S.C. 392, 408 (1884).

I disagree with the majority's interpretation of the language from *Shirer,* "received in trust," as meaning "received as a trustee." [2] In my opinion, the *Shirer* Court used the word "trust" in a lay sense, as in confidence in the integrity of another person. The Court was merely explaining the dichotomy between lawful and unlawful acquisitions in the context of larceny. A friend, an employee, or some other "trusted" person might receive property lawfully, but if he thereafter converts the property to his own use with *animus furandi,* then he is guilty of larceny through breach of trust with fraudulent intent.

---

**2.** Apparently, this interpretation was first made in *State v. LeMaster,* 231 S.C. 321, 98 S.E.2d 756 (1957).

In this case, that Parris lawfully received the Martins' money is undisputed. The Martins trusted that Parris had title to the mobile home, and they tendered their money as consideration. Because there is evidence that Parris converted the Martins' money for his own use, thus breaching their confidence, Parris was not entitled to a directed verdict.

If the State were in fact required to prove the existence of a trust, however, then the Court of Appeals' decision should be affirmed. There is no evidence that the Martins intended to be the settlors of a trust. As the Court of Appeals noted, the Martins were not even aware that FNB financed and held title to Parris's inventory. Had Parris owned title to the mobile home, as the Martins believed, then he would have used their money—their consideration under the sales contract—for his own benefit. He was not their trustee; there was no trust formed.

For the reasons stated, I concur in the result reached by the majority and join in the reversal of the decision of the Court of Appeals.