591 S.E.2d 600

**The STATE, Respondent,**

v.

**Kenneth CURTIS, Appellant.**

**No. 25762.**

Supreme Court of South Carolina.

Heard Oct. 21, 2003.

Decided Jan. 5, 2004.

Rehearing Denied Feb. 4, 2004.

---

C. Rauch Wise, of Greenwood, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Charles H. Richardson, Senior Assistant Attorney General Norman Mark Rapoport, all of Columbia; and Robert M. Ariail, of Greenville, for Respondents.

Justice WALLER:

Kenneth Curtis was convicted of two counts of the sale of urine with the intent to defraud a drug or alcohol test, in violation of S.C.Code Ann. § 16–13–470 (2003). We affirm.

## FACTS

In 1994, Curtis started a business known as Privacy Protection Services (PPS) which sells urine substitution kits to individuals. The kits contain urine, a pouch, a tube, a handwarmer device, duct tape, a pen, instructions for use, two business cards and a "Notice." The instructions advise how to use the heat pack to maintain proper temperature, how to affix the kit to the body for "maximum concealment," and instruct the user to check the temperature strip just before arriving at the collection center and to "dress in loose fitting clothing." The instructions also claim that "after thousands of kits and years of testing, no one has ever failed a test when using our kit." At the bottom of the instructions is a "Disclaimer Statement" which, among other things, states that "Privacy Protection Services does not market this kit for use in 'drug testing.'" A strip of paper, approximately 2″ by 8″ enclosed in the kits states that "Because of recent changes in South Carolina law, Privacy Protection Services no longer markets this URINE TEST substitution kit for use in 'DRUG TESTING'.... THIS PRODUCT IS SOLD AS A NOVELTY ONLY." However, also included in the kits are Privacy Protection Services business cards, stating "Pass Any Drug Test."

Curtis was indicted in July 2001, and charged with two counts of violating § 16–13–470.[1] The jury convicted him on both counts.

## ISSUES

1. Do the indictments sufficiently allege a crime?
2. Is the term "drug test" impermissibly vague?
3. Did the trial court err in allowing Curtis to be cross-examined regarding pornographic websites accessible from his internet website?
4. Did the court err in denying Curtis' motion for a directed verdict?

## 1. SUFFICIENCY OF INDICTMENTS

The indictments in this matter allege:

That KENNETH CURTIS did in Greenville County ... unlawfully, knowingly, and intentionally operate a business that sold a quantity of urine and a supplemental heating device, with the intent to defraud a drug or alcohol test. This being in violation of § 16–13–470 ...

Curtis asserts the indictments, while alleging his **business** sold urine with the intent to defraud, fail to allege that he, **individually,** had the intent to defraud a drug test. We disagree.

An indictment is sufficient if it apprises the defendant of the elements of the offense intended to be charged and apprises the defendant what he must be prepared to meet. *State v. Wilkes*, 353 S.C. 462, 464–465, 578 S.E.2d 717, 719 (2003). Further, an indictment is sufficient if the offense is stated with sufficient certainty and particularity to enable the court to know what judgment to pronounce, and the defendant to know what he is called upon to answer and whether he may

---

1. In 1999, the Legislature enacted S.C.Code Ann. § 16–13–470 which provides, in pertinent part:

   **Defrauding drug and alcohol screening tests; penalty.**
     (A) It is unlawful for a person to:
       sell, give away, distribute, or market urine in this State or transport urine into this State with the intent of using the urine to defraud a drug or alcohol screening test;

plead an acquittal or conviction thereon. *Id.* An indictment phrased substantially in language of a statute which creates and defines the offense is ordinarily sufficient. *State v. Shoemaker,* 276 S.C. 86, 275 S.E.2d 878 (1981).

The indictment here patently alleges that Curtis knowingly and intentionally operated a business which sold urine with the intent to defraud a drug test. If Curtis **knowingly and intentionally** operated a business which sold urine with the intent to defraud, it is patent that his conduct is within the ambit of the statute. The fact that the indictment does not allege that he personally sold urine with the intent to defraud is not fatal. We find no merit to this contention.

## 2. IMPERMISSIBLY VAGUE

Curtis next asserts § 16–13–470 is impermissibly vague inasmuch as it fails to define the term "drug test." We disagree.

Statutes are to be construed in favor of constitutionality, and this Court will presume a legislative act is constitutionally valid unless a clear showing to the contrary is made. *State v. Brown,* 317 S.C. 55, 451 S.E.2d 888 (1994). A legislative enactment will be declared unconstitutional only when its invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution. *See Westvaco Corp. v. South Carolina Dep't of Revenue,* 321 S.C. 59, 467 S.E.2d 739 (1995). The established test for vagueness is whether the statute provides "fair notice to those to whom the law applies." *Main v. Thomason,* 342 S.C. 79, 92, 535 S.E.2d 918, 925 (2000). A statute is not unconstitutionally vague if a person of ordinary intelligence seeking to obey the law will know, and is sufficiently warned of, the conduct the statute makes criminal. *Johnson v. Collins Entertainment Co., Inc.,* 349 S.C. 613, 564 S.E.2d 653 (2002). As Justice Toal noted in *Curtis v. State,* 345 S.C. 557, 549 S.E.2d 591 (2001), [a] law is unconstitutionally vague if it forbids or requires the doing of an act in terms so vague that a person of common intelligence must necessarily guess as to its meaning and differ as to its application. . . . One to whose conduct the law clearly applies does not have standing to challenge it for vagueness. 345 S.C. at 572, 549 S.E.2d at 598.

In *Curtis*, we upheld § 16–13–470 against challenges of vagueness for failing to define the terms "foil," "spike," "defraud," "bodily fluids," and "adulterate," stating, "all the Constitution requires is that the language convey sufficiently definite warnings as to the proscribed conduct when measured by common understanding and practices." *Id.*

Contrary to Curtis' contention, the term "drug test" clearly has a sufficiently common meaning to put him on notice of the conduct proscribed. *Main v. Thomason, supra.* Curtis alleges the statute is unduly vague in failing to specify that it is only the sale of urine with the intent to defraud testing for illegal drug usage which is prohibited. We disagree. Initially, we note that the Legislature, had it chosen to do so, could easily have specified that only the sale with the intent to defraud tests for illegal drugs was prohibited. Its failure to do so indicates its intent that the intent to defraud **any** drug test is illegal. *Stardancer Casino v. Stewart,* 347 S.C. 377, 556 S.E.2d 357 (2001); *Tilley v. Pacesetter,* 333 S.C. 33, 508 S.E.2d 16 (1998) (if legislature had intended certain result in statute it would have said so).

Curtis asserts that prohibiting the sale of urine with the intent to defraud **any** drug test is an unwarranted intrusion upon the privacy of those tested and that there is no legitimate purpose in allowing businesses to test employees or others for drugs which are not illegal. Curtis has no standing to assert the privacy rights of persons who are being tested. *State v. McKnight,* 352 S.C. 635, 576 S.E.2d 168 (2003)(one cannot obtain a decision as to the invalidity of an act on the ground that it impairs the rights of others). To the extent that an employee or person tested wishes to challenge the legitimacy of a certain test, they are free to do so. Further, the statute merely prohibits the sale of urine with the intent to defraud a drug test; it does not give businesses unfettered discretion to test.[2]

We find the term "drug test" sufficiently apprises Curtis of the conduct proscribed by the statute.

---

**2.** Although not the issue presented today, there are safety concerns which could conceivably justify a businesses' testing for drugs which are not in themselves illegal, but which could impair or hinder an employee's ability to perform a given task.

### 3.  PORNOGRAPHIC WEBSITE

Curtis next argues the trial court erred in permitting the state to cross-examine him concerning pornographic links on his website.

Curtis' website [3] provides the following information: "Our Complete Urine Test Substitution Kits allow anyone, regardless of substance intake, to pass any urinalysis within minutes."  It further states:

> Proven real world protection from urine testing invasions ... Designed to easily be concealed on the body the kits are complete with chemically reactive supplemental heat sources and temperature monitoring system that insures proper acceptance temperature is maintained (Proper temperature is a critical element for acceptance at any testing site).  You can use our kit in a natural urinating position, unisex (male or female), and you cannot be detected even if directly observed....
>
> **Our Kits Work!!!**
>
> We guarantee 100% satisfaction and 300% results.  It works because it's easy to use and gives the piss police what they want....
>
> After thousands of sales no one has ever failed a test when using our kit.

At trial, the state began its presentation of the case by calling SLED agent West, who investigated the case against Curtis, and inquiring about the contents of the PPS website. A printout from the website was entered into evidence, and Agent West was extensively questioned concerning the contents of the site and the claims therein.  The state introduced this information for the purpose of establishing Curtis' intention in selling the urine substitution kits.

After the state rested, the first person called by the defense was Curtis' webmaster, James Turner.  Turner was questioned concerning the contents of the website, and whether, at Curtis' request, all references to "drug testing" had been removed from the site subsequent to the passage of § 16–13–470.  Counsel then began going through the website with him page by page, beginning with a "Media Archives" section,

---

3.  The website may be found at www.privacypro.com.

which included clips of Curtis' appearances on various television shows. The defense then moved to the "Links" section of the website and asked Turner to explain to the jury how they decided what links to incorporate into the site. Turner explained that they had an "open-link" policy, and that anybody who wanted a link on the site could just email him with an address. On cross-examination of Turner, the state queried whether all of the links on the site were subject to Curtis' approval, and whether there were any sites with which they did not want to be associated. Turner replied that they did not allow pornographic material or links to pornographic material.

Subsequent to Turner's testimony, Curtis was questioned on direct exam about the contents of the website. His attorney asked about the "Links" page and how links get onto the page. Curtis responded that "[w]e have a free association link policy. I do ask not to have pornography sites listed because, first of all, I chose a web server that does not host pornography sites because I personally object to pornography on the web because it often is slipped in." Thereafter, on cross-exam, the state questioned Curtis about his website while actually clicking through it on a computer screen, demonstrating that it was possible to access pornographic links via other links on Curtis' website. The line of inquiry went on for approximately three and one-half transcript pages before defense counsel objected on the basis of relevancy. Curtis was then allowed to explain that he "did not list those things on my site. They are links from someone else's site. They're not—They have nothing to do with my site." Curtis now asserts the inquiry concerning pornographic websites was irrelevant and misleading. We disagree.

■■■■■ A party cannot complain of an error which his own conduct created. *State v. Whipple,* 324 S.C. 43, 476 S.E.2d 683, *cert denied* 519 U.S. 1045, 117 S.Ct. 618, 136 L.Ed.2d 541 (1996) (party cannot complain of error which his own conduct has induced). Given that both Curtis and Turner maintained that PPS did not allow pornographic materials or links on the website, it is patent that they opened the door to this line of inquiry. *See State v. Foster,* 354 S.C. 614, 582 S.E.2d 426 (2003)(when a party introduces evidence about a particular matter, the other party is entitled to explain it or rebut it,

even if the latter evidence would have been incompetent or irrelevant had it been offered initially). Moreover, counsel raised no objection to the inquiry until several pages of testimony concerning the pornographic links had been taken. We find counsel's objection came too late. *State v. Hoffman*, 312 S.C. 386, 393, 440 S.E.2d 869, 873 (1994) (contemporaneous objection is required to properly preserve an error for appellate review).

■ Further, even assuming *arguendo* we were to review the issue, we agree with the state that given Curtis' own testimony that there were no pornographic links on his website, the inquiry was relevant to his credibility. *Yoho v. Thompson*, 345 S.C. 361, 548 S.E.2d 584 (2001)(a witness may be cross-examined on any matter relevant to any issue in the case, including credibility and considerable latitude is allowed in this regard).

■ Finally, Curtis was not prejudiced by the inquiry. *State v. Locklair*, 341 S.C. 352, 535 S.E.2d 420 (2000) (error without prejudice does not warrant reversal). Curtis repeatedly testified before the jury that the pornographic links were **not** in fact links from his site, but were links from other links. Accordingly, we find no error.

## 4. DIRECTED VERDICT

Curtis lastly argues the trial court erred in denying his motion for a directed verdict as the state presented "no evidence that this particular sale was made with the intent to defraud a drug test." We disagree.

■ A defendant is entitled to a directed verdict when the State fails to produce evidence of the offense charged. *State v. McHoney*, 344 S.C. 85, 97, 544 S.E.2d 30, 36 (2001). In reviewing a motion for directed verdict, the trial judge is concerned with the existence of the evidence, not with its weight. *State v. Mitchell*, 341 S.C. 406, 409, 535 S.E.2d 126, 127 (2000). On appeal from the denial of a directed verdict, an appellate court must view the evidence in the light most favorable to the State. *State v. Burdette*, 335 S.C. 34, 46, 515 S.E.2d 525, 531 (1999). If there is any direct evidence or substantial circumstantial evidence reasonably tending to

prove the guilt of the accused, the Court must find the case was properly submitted to the jury. *State v. Pinckney*, 339 S.C. 346, 529 S.E.2d 526 (2000).

Curtis argued at trial only that he was entitled to a directed verdict on the basis that he was not directly involved in the sale of the kits in question and that there was no evidence the individual who purchased his urine kits had any intent to defraud a drug test. He now asserts he was entitled to a directed verdict on the ground that there is no evidence the kits were sold with the intent to defraud. Accordingly his current argument is not preserved for appeal. *State v. Byram*, 326 S.C. 107, 485 S.E.2d 360 (1997) (party cannot argue one basis in support of motion at trial and another ground on appeal).

In any event, there is ample evidence to warrant submission of the case to the jury. As noted previously, the kits which form the basis of this case contain warming devices and temperature indicator devices to ensure the urine is at the proper temperature for acceptance (91–101 degrees).[4] The kit gives instructions, with photos, as to how to affix it to your body for proper temperature transfer and maintenance and stresses that the location between the breast and armpit "allows for maximum concealment, comfort, temperature monitoring, and allows pressure to be applied with the upper arm to assist flow." Although there is a Disclaimer at the bottom of the instructions which indicates that "Privacy Protection Services does not market this kit for use in drug testing," business cards enclosed with the kits state, in bold print, "Pass Any Drug Test." Additionally, the state submitted evidence of an email from Privacy Protection Services to an individual who inquired about selling Curtis' products. In the email, Curtis gives an example of the response they give to inquiries, stating

"We can provide a COMPLETE KIT that will allow ANYONE regardless of drug intake to pass ANY urine test within minutes after receiving it . . . That being said let me

---

4. In *Curtis, supra,* the Court held unconstitutional section 16–13–470's presumption of intent from the sale of a warming device with the urine. However, the sale of a warming device is nonetheless evidence which the jury may consider in determining the defendant's intent.

explain what we offer and why it is the only real world answer to the invasion of drug testing .... the hardest thing about using this kit is to avoid putting your own sample in the cup."

Further, Curtis' website makes the claim that "Our Complete Urine Substitution Kits allow anyone, regardless of substance intake, to pass any urinalysis within minutes." We find this is ample evidence to submit to the jury on the issue of whether Curtis was selling urine kits with the intent to defraud drug tests. His motion for a directed verdict was properly denied.

## CONCLUSION

Curtis' convictions for violation of § 16–13–470 are affirmed.[5]

TOAL, C.J., MOORE, and BURNETT, JJ., concur.

PLEICONES, J., concurring in result only.

---

5. The remaining issue is affirmed pursuant to Rule 220(b), SCACR, and the following authority: Curtis' Issue 3–*Ex Parte Littlefield*, 343 S.C. 212, 540 S.E.2d 81 (2000)(discretion to prosecute is solely in prosecutor's hands).