THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS 
 PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
The State, Respondent,
v.
Travis Whitmire, Appellant.
 
 
 

Appeal From Greenville County
 Edward W. Miller, Circuit Court Judge

Unpublished Opinion No. 2006-UP-410
Submitted December 1, 2006  Filed December 13, 2006

AFFIRMED

 
 
 
Assistant Appellate Defender Aileen P. Clare, of Columbia, for Appellant.
Attorney General Henry D. McMaster; Chief Deputy Attorney General John W. McIntosh; Assistant Deputy Attorney General Salley W. Elliott; Assistant Attorney General Shawn L. Reeves, of Columbia; Solicitor Robert M. Ariail, of Greenville; for Respondent.
 
 
 

PER CURIAM:  Appellant, Travis Whitmire, was indicted and tried for first-degree burglary, conspiracy, and three counts of armed robbery.  Whitmire was convicted of the conspiracy and burglary charges, as well as two of the armed robbery charges, and the trial court sentenced him to concurrent sentences of twenty-five years on the burglary and armed robbery convictions, and five years for conspiracy. Whitmire appeals, asserting the trial court erred in denying his motion for a directed verdict.  We affirm.[1]
FACTUAL/PROCEDURAL BACKGROUND
On the night of November 8, 2001, Corey Bagwell and his girlfriend Kami Johnson were in their bedroom in the trailer they shared with Coreys brother, Jonathan.  Around 10:00 p.m., Corey was falling asleep and Kami was watching television when a black male with a rifle quickly pushed open their bedroom door.  This man alerted another that there was somebody else in here, and a second black male entered the room with a pistol grip shotgun.  The two men told Corey to give them all his money.  When Corey reached for his wallet one of the men hit him in the head with a gun.  Corey gave them his wallet, which contained approximately $50.  The two men grabbed a DVD player and began tearing [the bedroom] apart, pulling things out of a closet, a trunk and some drawers.  The men were yelling for more money, and Corey told them to look in his entertainment center, where there was $2,800 in cash.  The $2,800 was money borrowed for the purpose of Kamis school tuition.  During this ordeal, Corey could hear someone else yelling like the two men in his room had been, and he assumed it was someone talking to his brother, Jonathan.  
After the men finished ransacking the bedroom and collecting the money, they made Corey and Kami crawl on their hands and knees into the living room.  Once in the living room, Corey saw his brother, as well as his brothers friend who was being dragged across the floor by another male.  The intruders screamed that it wasnt a game, and two of the men ran out while the third man with the pistol grip shotgun made the victims crawl into the kitchen.  The third man stood on the back porch waiting for a car.  When Corey heard tires squealing, he looked up to make sure they were gone and went next door to check on his parents.  Corey stated he had never seen the three men that came into his home before that night.  When he and Kami were driven to a location by officers to view some suspects, both told the officers that the two men at the location were two of the men that had robbed them that night.  They later learned that one of the men was not ultimately charged in the case.  
Jonathan testified that on the night of November 8, 2001, his friend Ray Godfrey was visiting him at his home.  An acquaintance of his, Amber Nalley, called and indicated she and a friend wanted to come over to his home.  Jonathan had never met Ambers friend, but had spoken to her on the phone that night.  When the girls arrived, they walked back to Jonathans bedroom where Ray was.  They planned to watch a movie and chill with the girls.  At some point, both girls left the room to go to the bathroom.  Jonathan thought the two would come walking back into the bedroom, but instead a man appeared with a shotgun.  The man asked where a key was to a filing cabinet and demanded money.  Another man appeared and began ripping things off of Jonathans entertainment center, and going through his jewelry and closet.  Jonathan saw two guns, a long one and a short pistol grip.  The second man did not stay in his room very long, but left and went through the house to another room.  The men were asking Jonathan for money and when he did not respond quickly, one of them hit Jonathan in the back of the head with the longer shotgun.  Jonathan stated he blacked out after he was hit, and when he came to, he and Ray were instructed to go toward the kitchen.  Ray was being kicked and drug across the floor into the other room while Jonathan was forced to crawl in there on his hands and knees.  He was on one side of the bar in the kitchen when he saw Corey and Kami brought out there and placed on the other side of the bar.  The intruders took Jonathans watches and some money, including $160 from his filing cabinet and between $50 and $70 from his pocket.  They also took some money and some drugs from Ray.  Jonathan stated he had never seen any of these men before that night.  After the intruders left, Jonathan called the police.  When they arrived, he gave them Amber Nalleys name and told them where she lived.  
Officers Ridgeway and Weiner with the Greenville County Sheriffs Office received information over their radios concerning Amber Nalley as a suspect in this matter.  Officer Weiner knew Amber from previous dealings and knew where she lived.  The two officers therefore responded to the location of Ambers address.  As Officer Weiner spoke to Ambers grandmother in the home, Officer Ridgeway remained on the street.  While standing near his vehicle, Officer Ridgeway observed a car matching the description of the suspects vehicle about a block away.  The car stopped, turned, and went up a street.  The officer noticed the car was traveling at a low rate of speed and without any lights.  He then saw it being driven at a high rate of speed at which time Officer Ridgeway pursued the vehicle until it eventually stopped in a driveway.  Officer Ridgeway observed two females in the front seat, and two black males in the back seat.  The males were shoving the seats onto the females, attempting to get out of the car.  When the males did finally exit the car, they ran off in different directions.  The two females in the car were Lauren Revelle and Amber Nalley.  Amber and Lauren were arrested and transported to the law enforcement center.  The two males, who were caught a short time later in the area, were Frederick Harris (Fred) and Shamar Harris.  At the time of his apprehension, Fred had $457.26 in his possession.  Officers also recovered Jonathans two watches in the area where Fred was hiding.  Fred was arrested in regard to this matter.  Shamar was also arrested, but his arrest was based on a warrant unrelated to this matter.  
Based on statements made by Lauren and Amber, the officers executed a search warrant at the home of Fred.  There they recovered a pistol grip shotgun and a long rifle shotgun that Corey testified looked like the guns he observed in the home invasion.  Officers also searched room 106 at the best Way Motel after receiving consent from Lauren Revelle.  There they collected a handwritten note with a message in parentheses in the top corner of Im getting some cards and the following main notation on that side:  Fred, call me at the house.  I called a cab to take the yamean to the house.  I left at 11:10 p.m., me and Mark together.  Call me, man, I want to come back.  The reverse side of the note stated, I will be back, went home.  An expert in the area of handwriting analysis determined appellant had written the front side of the note referring to calling a cab to take the yamean to the house.  She concluded the reverse side of the note was written by someone named Mark Johnson.  
Lauren Revelle testified on behalf of the State.  She stated that at the time of the incident, Fred was her boyfriend.  She had never met Amber Nalley prior to that day, but did know Mark Johnson and appellant through Fred.  The afternoon of the robbery, she received a call from appellant and Mark.  The three of them then picked up Amber, who showed them how to get to the targeted house.  At that time, no one had any guns with them.  From that location, they drove to Ambers house and dropped her off.  Appellant, Mark and Lauren then went to appellants apartment, where appellant called Fred and told him they had seen the house and that Amber had recommended the robbery take place that evening.  After running some errands, they went back to appellants apartment and waited for Fred to call.  Appellant eventually called Fred, at which time they decided to meet at a Hardees.  From there, Lauren, Fred, Mark and appellant went to Freds apartment.  Fred and Mark came out with two bags with guns in them.  From there, the four went to the targeted location.  They had planned for Lauren to drop the three men off and wait on them while they robbed the people inside.  Fred, Mark and appellant exited the car with the guns, but came back to the car about two minutes later because they did not have a means of getting into the house and they were concerned about some dogs.  They drove to a gas station where Fred called Amber, and then subsequently drove to Ambers house where Mark, Fred, Amber and appellant discussed a new plan.  Amber was to arrange a visit to the house on the pretense of buying drugs and then let the others into the house.  
Amber stated she called Jonathan as planned and Jonathan said they could come over and do some stuff for free.  They all then went over to the location, where Lauren and Amber dropped Fred, Mark and appellant off with the guns about one hundred feet from the house.  The plan was for Mark to get the stuff and appellant and Fred to have the guns.  Amber and Lauren were let into the house and went back to the bedroom where they watched TV and talked to Jonathan and his friend.  Amber and Lauren left the room to go to the bathroom.  At that time, Lauren signaled Fred, Mark and appellant by opening the blinds on the door.  Within a minute, the door opened and Fred, Mark and appellant came into the house.  The bedroom door opened and Lauren heard yelling and saw guns being pointed.  She testified it was Fred and appellant who had gone into the bedroom.  The intruding men were loud and mean, demanding things and cussing.  Lauren and Amber ran out to the car and drove a little bit up the road.  Fred, Mark and appellant came back to the car with the guns, a DVD player, bags of jewelry, drugs and money.  The five then went to Best Way Motel, where Lauren got them a room, and they counted up the money and split everything three ways.  Lauren, Fred and Amber left Mark and appellant at the hotel because Fred wanted to take the guns back to the apartment and Amber wanted to get her things from her house.  They planned to meet Mark and appellant back at the hotel.  The three went to Freds apartment, where Fred took the guns inside and brought his cousin, Shamar Harris, back out with him.  They headed to Ambers house, where they saw the police cars and attempted to avoid them.  When they subsequently stopped, Fred and Shamar ran from the car and Lauren and Amber were arrested.  
Amber testified she signed a release for them to search the hotel room.  She stated the word yamean on the note found in the hotel room was slang for you know what I mean and referred to the stuff.  In exchange for her cooperation, Lauren was offered a plea bargain where the State would recommend probation for her.  She pled guilty to conspiracy and received a probationary sentence.  
After the State rested, appellant moved for a directed verdict as to the robbery of Kami asserting there was no theft of her property since the money taken was obtained by Corey.  He further asserted he was entitled to a directed verdict on the entire case because the State did not have enough to move forward.  The trial court denied both motions.  Following their presentation of alibi evidence, the defense rested and renewed its previous motions, which the trial court denied.  The jury found appellant guilty of conspiracy, burglary in the first degree, and two counts of armed robbery involving Corey and Jonathan.  Appellant was acquitted of armed robbery of Kami.  
LAW/ANALYSIS
On appeal, appellant contends the trial court erred in denying his motion for directed verdict because no probative evidence placed appellant at the scene of the crime.  He argues the only evidence placing him at the scene was the wholly unreliable testimony of Lauren Revelle, who received a reduced sentence in exchange for her testimony. He maintains Laurens testimony was extorted by the States promises and it should not qualify as substantial probative evidence, particularly in light of the facts that the victims identified another man and there was no physical evidence to implicate him.  
It is questionable whether appellant has preserved this argument for our review.  Although he did generally argue the evidence was insufficient in his directed verdict motion, he never argued below, as he does now, that the evidence was insufficient because there was no probative evidence of his presence at the scene of the crime.  See State v. Freiburger, 366 S.C. 125, 135, 620 S.E.2d 737, 742 (2005) (The rule is well established that if asserted errors are not presented to the lower Court, the question cannot be raised for the first time on appeal.);  State v. Johnson, 363 S.C. 53, 58-59, 609 S.E.2d 520, 523 (2005) (an objection should be addressed to the trial court in a sufficiently specific manner that brings attention to the exact error and if  a party fails to properly object, the party is procedurally barred from raising the issue on appeal);  State v. Curtis, 356 S.C. 622, 634, 591 S.E.2d 600, 606 (2004) (appellant, who argued at trial only that he was entitled to a directed verdict on the basis that he was not directly involved in the sale of urine kits and that there was no evidence the individual who purchased his urine kits had any intent to defraud a drug test, failed to preserve for appellate review his claim on appeal that he was entitled to a directed verdict on the ground there was no evidence the kits were sold with the intent to defraud);  State v. Nichols, 325 S.C. 111, 120-21, 481 S.E.2d 118, 123 (1997)  (An issue may not be raised for the first time on appeal, but must have been raised to the trial judge to be preserved for appellate review.)       
Even if this general objection is deemed sufficient to preserve the specific grounds now argued on appeal, we find no error in the trial courts denial of the motion.  In ruling on a motion for directed verdict in a criminal case, a trial court must view the evidence in the light most favorable to the
State.  State v. Wakefield, 323 S.C. 189, 196, 473 S.E.2d 831, 835 (Ct. App. 1996).  The trial court is concerned with the existence or nonexistence of evidence, not its weight.
 State v. Gaster, 349 S.C. 545, 555, 564 S.E.2d 87, 92 (2002). A defendant is entitled to a directed verdict when the
State fails to produce evidence of the offense charged.  State v. McHoney, 344 S.C. 85, 97, 544 S.E.2d 30, 36 (2001).  Furthermore, the trial court should not refuse to grant the directed verdict motion when the evidence merely raises a suspicion that the accused is guilty.
 State v. Mitchell, 341 S.C. 406, 409, 535 S.E.2d 126, 127 (2000).
When reviewing a denial of a directed verdict, this court, as well, must view the evidence and all reasonable inferences in the light most favorable to the
State. State v. Weston, 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006).  If there is any direct evidence or substantial circumstantial evidence reasonably tending to prove the guilt of the accused, we must find the case was properly submitted to the jury.
 State v. McCombs, 368 S.C. 489, 493, 629 S.E.2d 361, 363 (2006).  
Here, the State presented sufficient evidence of appellants participation in the crimes to support the trial courts denial of the directed verdict motion.  Lauren testified appellant participated in the planning of the crime, and was one of the three men who entered the home with guns that evening.  She specifically pointed appellant out as having entered Jonathans bedroom, demanding things and cussing in a loud manner.  The fact that appellant asserts Laurens testimony should not be believed is not a basis for a directed verdict.  Instead, appellants argument creates a credibility issue to be resolved by the jury.  See State v. Ham, 268 S.C. 340, 342, 233 S.E.2d 698, 698 (1997) (Where the determination of guilt is dependant upon the credibility of the witnesses, a motion for a directed verdict is properly refused.)  Additionally, the testimony from the victims corroborates that three men were involved in the home invasion, along with Lauren and Amber.  Laurens testimony also explains how Shamar, who was not arrested in this matter, came to be with her, Amber and Fred when they were stopped by the police, and Mark and appellant were not.  Finally, appellants presence at the hotel room, which Lauren indicated she registered for after the home invasion, was corroborated through testimony from the handwriting expert linking the note found in the room that night to appellant. 
For the foregoing reasons, appellants convictions are
AFFIRMED.
ANDERSON, HUFF, and WILLIAMS, JJ., concur.

[1] We decide this case without oral argument pursuant to Rule 215, SCACR.