**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Supreme Court**

The State, Respondent,

v.

Paris Avery, Petitioner.

Appellate Case No. 2011-194506

———————

**ON WRIT OF CERTIORARI TO THE COURT OF APPEALS**

———————

Appeal from Beaufort County
Carmen T. Mullen, Circuit Court Judge

———————

Memorandum Opinion No. 2013-MO-016
Heard April 30, 2013 – Filed June 12, 2013

———————

**REVERSED**

———————

Appellate Defender David Alexander, of Columbia, for Petitioner.

Attorney General Alan M. Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Salley W. Elliott, Assistant

Attorney General Mark R. Farthing, all of Columbia; and Solicitor Isaac M. Stone, III, of Bluffton, for Respondent.

---

**JUSTICE HEARN:**  Paris Avery was convicted of homicide by child abuse in the death of her fifteen-month-old son (Victim) from an overdose of prescription medicine.  The court of appeals affirmed her conviction in *State v. Avery*, Op. No. 2011-UP-140 (April 5, 2011).  We hold the State failed to present evidence Avery acted with extreme indifference to human life and reverse.

## FACTUAL/PROCEDURAL BACKGROUND

On August 18, 2006, Avery took her children, Victim and his two brothers, to daycare around 10:30 a.m. and then went to work at the Golden Corral until 5:00 p.m.  After work, she and a co-worker, Angenetta Wright, picked up her children from daycare around 6:00 p.m.  The women and children then returned to the Golden Corral for dinner around 7:00 p.m.  They stayed approximately one hour, after which Wright took Avery and the children home to Avery's house.

Later in the evening, around 10:00 p.m., Wright drove back to Avery's house to check on her because Wright was supposed to watch the children that night when Avery returned to work.  Avery was asleep, but Wright woke her up and told her she had to go to work or she would be fired.  Wright helped Avery get her children ready to leave and then drove them back to Wright's house, and Avery put Victim in Wright's bed.  Avery then left for the Golden Corral and returned about an hour later, around midnight.  After checking on Victim, she asked Wright what was wrong with him because she could not wake him.  Avery slapped his face in an attempt to revive him.  Wright then splashed water on him, but Victim did not respond, so Wright called 911.

Paramedics found Victim unrevivable, and concluded he had not been breathing and had not had a pulse for twenty to thirty minutes.  When a criminal investigator arrived, Avery informed her Victim suffered from eczema and was taking hydroxyzine, a medication to relieve the itching.  After the medication was retrieved from Avery's house, it was ascertained that although the prescription had been filled only two days earlier, the bottle was over half empty.  The dosage on the label directed the dispensation of "one-half teaspoon by mouth every six hours as needed."  Avery informed the investigator she gave Victim three doses that day, at around 9:00 a.m., 3:00 p.m., and sometime after 8:00 p.m.

Dr. Michael Caplan performed an autopsy on Victim and found the organs were congested, there was fluid in the lungs, and the brain was swollen, all consistent with asphyxiation or depression of the respiratory system. Dr. Caplan also tested Victim's blood and found hydroxyzine at a concentration of 300 nanograms per milliliter, significantly above the expected therapeutic concentration of less than 50 nanograms per milliliter. Dr. Caplan concluded the cause of death was acute hydroxyzine intoxication and ruled the death a homicide.

Avery was subsequently arrested and indicted for homicide by child abuse. At trial, the State presented the testimony of Dr. Demetra Garvin, a forensic toxicologist. Although Garvin did not rule out the possibility this was an intentional poisoning, she opined that the circumstances of Victim's death indicated the hydroxyzine may instead have been used as a "chemical restraint." Dr. Garvin described chemical restraint as the use of medication for the desired side effect of sedation as opposed to the proper indications of the drug. She testified hydroxyzine is an antihistamine commonly used to treat itching and that the primary side-effect is sedation. Additionally, she noted it was a drug of last resort for the pediatric population, which indicated to her that Victim's skin condition must have been "significant." She testified the prescription called for one-half teaspoon every six hours as needed and a syringe was found with the medication which was calibrated in both half-teaspoon and milliliter measurements. Dr. Garvin further opined that the peak effect of the drug in liquid form probably would have occurred two hours after the fatal dosage. She further noted the prescription was filled around 3:30 p.m. on August 16, and Victim died around 12:30 a.m. August 19, which would account for ten doses of the medication if taken as directed. However, after measuring the volume of the liquid remaining in the bottle, there appeared to be an additional seventeen doses missing. The pharmacy lab technician testified the prescription for Victim was picked up on August 16, but could not identify who picked it up either on that day or when it was originally filled on June 7, 2006.

After the close of the State's case, Avery moved for a directed verdict, arguing the State failed to put forth evidence she acted with extreme indifference to human life. The court denied the motion. The jury convicted Avery of homicide by child abuse and the court sentenced her to thirty-five years' imprisonment. Her conviction was affirmed by the court of appeals, and we granted certiorari.

## ISSUE PRESENTED

Did the court of appeals err in affirming the circuit court's denial of a directed verdict when the State failed to prove Avery acted with extreme indifference to human life?

## LAW/ANALYSIS

Avery argues the State failed to introduce evidence she acted with extreme indifference to human life and therefore the circuit court erred in denying her motion for a directed verdict on the charge of homicide by child abuse. We agree.

In reviewing a motion for a directed verdict, the circuit court is concerned with the existence of evidence, not its weight. *State v. Curtis*, 356 S.C. 622, 633, 591 S.E.2d 600, 605 (2004). When the evidence presented merely raises a suspicion of the accused's guilt, the circuit court should grant the directed verdict motion. *State v. Cherry*, 361 S.C. 588, 594, 606 S.E.2d 475, 478 (2004). However, the circuit court must submit the case to the jury if there is "**any substantial evidence** which reasonably tends to prove the guilt of the accused, or from which his guilt may be fairly and logically deduced." *State v. Mitchell*, 341 S.C. 406, 409, 535 S.E.2d 126, 127 (2000).

On appeal from a denial of a directed verdict motion, the appellate court views the evidence in the light most favorable to the State. *Curtis*, 356 S.C. at 633, 591 S.E.2d at 605. "If there is any direct evidence or substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the Court must find the case was properly submitted to the jury." *Id.* at 633–34, 591 S.E.2d at 605.

Section 16-3-85 of the South Carolina Code (2003) provides: "A person is guilty of homicide by child abuse if the person . . . causes the death of a child under the age of eleven while committing child abuse or neglect, and the death occurs under circumstances manifesting an extreme indifference to human life." In the context of criminal statutes, indifference has been likened to a conscious act of disregarding a risk which a person's conduct has created, or a failure to exercise ordinary or due care. *State v. Jarrell*, 350 S.C. 90, 98, 564 S.E.2d 362, 367 (Ct. App. 2002). For purposes of this statute, "extreme indifference" has been described as "a mental state akin to intent characterized by a deliberate act culminating in death." *McKnight v. State*, 378 S.C. 33, 48, 661 S.E.2d 354, 361 (2008) (quoting *Jarrell*, 350 S.C. at 98, 564 S.E.2d at 367).

The court of appeals concluded "Although she may not have intended her act [of giving Victim hydroxyzine] to culminate in [Victim's] death, viewing the evidence in the light most favorable to the State, the State established Avery committed a deliberate act and [Victim] died as a result of that act." *Avery*, Op. No. 2011-UP-140. Essentially, the court of appeals concluded that because the State put forth substantial probative evidence that she administered the hydroxyzine and Victim ultimately died from a hydroxyzine overdose, the act and resultant death are sufficient to prove her mental state. However, this conclusion renders the statutory requirement of *mens rea* meaningless and suggests the State need only produce evidence of the *actus reus* and subsequent death.

Although the State is not required to prove Avery acted with the intent to kill Victim, "extreme indifference" contemplates a showing of "actions that evidence a mental state on the part of the accused to engage in some life-threatening activity against the victim." *Price v. State*, 284 S.W.3d 462, 466 (Ark. 2008); *see also* 40 C.J.S. *Homicide* § 42 ("While intent may not be necessary under provisions [requiring depraved or extreme indifference to human life], something more than mere recklessness is comprehended, and a gross deviation from a reasonable standard of care may not be sufficient."). Accordingly, the State must submit evidence the defendant consciously engaged in a life-threatening act with indifference as to whether Victim lived or died to establish the requisite mental state. *See State v. Reyes*, No. 36136-1-II, 2008 WL 4355376, at *6 (Wash. Ct. App. 2008) (holding that under the homicide by child abuse statute, to prove a defendant acted with extreme indifference, the State must show the defendant simply did not care whether the victim lived or died).

We find the State failed to submit evidence indicating Avery was aware of the gravity of the danger in overmedication so as to prove she acted without regard as to whether Victim lived or died. The State argues the risks associated with a prescription drug are "inherent and clear due to the controlled and regulated nature of the substance." However, this medication was lawfully prescribed for Victim, whose eczema was apparently acute. Certainly, in large enough doses even over-the-counter medication can be lethal, but the State's own witness opined the Victim's toxicity levels would more likely indicate chemical restraint than poisoning. Assuming *arguendo* Avery was overmedicating Victim in an effort to help him settle down so that she could sleep, this alone does not demonstrate she was acting without regard as to whether Victim lived or died. She may have simply been trying to alleviate his constant skin irritations, unaware of the grave risks of extra doses. Absent more, the State has not shown Avery consciously engaged in life-threatening behavior toward Victim.

The State offered no evidence Avery was ever personally informed about the risks of overmedication or that she understood the drug was to be taken as needed, but not more than every six hours. The pharmacist technician did not know who picked up the prescription and there was no evidence the prescribing physician discussed the side-effects or dosages with Avery. The State's sole evidence of Avery's *mens rea*, apart from the general allegation that it is common knowledge that death may occur from improper dosage, was the medicine bottle label that indicated it should be taken by mouth every six hours as needed. Even viewing this evidence in the light most favorable to the State, this does not amount to substantial circumstantial evidence from which a jury could conclude Avery acted without care as to whether Victim lived or died so as to manifest extreme indifference to human life.

## CONCLUSION

For those reasons, we find the court of appeals erred in affirming the circuit court's denial of a directed verdict in favor of Avery and reverse her conviction.

**TOAL, C.J., PLEICONES, and BEATTY, JJ., concur. KITTREDGE, J., dissenting in a separate opinion.**

**JUSTICE KITTREDGE**:  Viewing the evidence in a light most favorable to the State, as we must, I agree with the able trial judge that the State's evidence was sufficient to create a jury question.  I believe the directed verdict motion was properly denied.  I would affirm the conviction and sentence.  Accordingly, I respectfully dissent.