FILED
**United States Court of Appeals**
**Tenth Circuit**

**March 18, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

CHARLES WARNER,

    Defendant - Appellant.

No. 22-2092

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:19-CR-04275-WJ-1)**

_____

Joel R. Meyers, Law Office of Joel R. Meyers LLC, Santa Fe, New Mexico, for
Defendant-Appellant.

Jaymie L. Roybal, Assistant United States Attorney (Alexander M.M. Uballez, United
States Attorney, with her on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.

_____

Before **HOLMES**, Chief Judge, **BACHARACH**, and **EID**, Circuit Judges.

_____

**EID**, Circuit Judge.

_____

Appellant Charles Warner was convicted in federal district court in New
Mexico on one count each of being a felon in possession of a firearm and dealing in
firearms without a license. Warner appeals his conviction on four grounds, alleging
that (1) he is not a person prohibited from owning firearms under 18 U.S.C. § 922(g),

(2) his suppression challenge regarding evidence seized at his house subject to a warrant was improperly denied, (3) the evidence was insufficient to convict him of dealing in firearms without a license, and (4) the number of firearms in his possession was improperly counted to be between 25 and 99.

Warner's arguments all fail. We first hold that Warner is a "prohibited person" under § 922(g) because he has two prior state-law felony convictions for which he could have been sentenced to more than one year of imprisonment, and following which he has not yet had all of his civil rights restored. We also reject Warner's as-applied challenge to § 922(g), holding that his constitutional argument is foreclosed by recent Tenth Circuit precedent.

As to his second claim, we hold that any alleged error in the denial of Warner's suppression motion was harmless because none of the evidence Warner sought to suppress actually came in during the prosecution's case-in-chief. Next, we reject Warner's sufficiency-of-the-evidence challenge and hold that the evidence was sufficient to convict him of dealing in firearms without a license because the evidence showed that Warner built and sold firearms for years, despite knowing that he was prohibited from doing so. Finally, we hold that the district court could properly find that Warner possessed between 25 and 99 firearms based on detailed expert testimony.

Accordingly, exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**I.**

This case begins in South Carolina, over twenty years ago.  Defendant Charles

Warner was convicted of two felony offenses in the state, one each in 1996 and 2002.

In each case, he was convicted of Breach of Trust with Fraudulent Intent (value

greater than $1,000) under S.C. Code Ann. § 16-13-230(B)(2)—a crime similar to

larceny or embezzlement.  Although he could have received active prison time in

excess of one year for each offense, Warner received only probation.  Sometime after

his probation was complete, he moved to New Mexico.[1]

Since then, Warner has been significantly involved with firearms and the

firearm business.  In 2014, Warner and a few other individuals formed a company

called Elite Warrior Armament ("EWA"), a business selling customized firearms.

EWA applied for a federal firearms license ("FFL"), but Warner and his business

partners decided to omit Warner's name from the application because of his prior

felony convictions.[2]  And a few months after forming EWA, Warner removed himself

---

[1] In 2012, Warner was charged in New Mexico for possession of a firearm by a felon.  He pleaded guilty to that charge in 2013 but received a conditional discharge after he successfully completed probation.  As one of the conditions for the discharge of his conviction, Warner is generally prohibited from possessing firearms under New Mexico law.  But because Warner's New Mexico conviction was discharged, it did not serve as a predicate offense for Warner's eventual investigation and prosecution under 18 U.S.C. § 922(g)(1); instead, the government relied solely on the South Carolina convictions.  Accordingly, we need not consider the New Mexico conviction for purposes of this appeal.

[2] FFL applications require entities to list the names of any "responsible person[s]," *see* ATF Form 7 (5310.12A)-7CR(5310.16), which generally refers to any person who is "responsible for the operation of [the FFL] and [the firearms] business," R. Vol. IV at 262.  Additionally, any controlling members of a business, including members of an LLC, are typically listed on an FFL, unless any such

from the company's corporate documents, having realized that he could not be formally or directly involved in the business's firearms operations. Despite doing so, Warner remained involved in the business, purportedly as a consultant.

When the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") reviewed EWA's FFL application, it became concerned that Warner remained more involved in EWA than the company had let on. In December 2014, two ATF agents visited EWA's business, where they encountered Warner. The ATF agents informed Warner of his felony conviction status and handed Warner a copy of his South Carolina conviction; in response, Warner acknowledged that he knew he was a felon. The ATF agents also informed Warner that, because of his conviction status, he could not handle, possess, or otherwise have access to anything meeting the legal definition of a firearm. A few months later, ATF also hand-delivered a letter to EWA, notifying the company that Warner was a felon and could not have access to, or involvement with, firearms, even if he remained involved with the business.

Having notified EWA of the restrictions on Warner's involvement with the business, ATF ultimately approved the business's FFL application in April 2015. EWA, however, did not heed ATF's warnings: Warner continued to handle firearms in his role at EWA, including by manufacturing, building, and fixing firearms. For some time, the extent of Warner's involvement with EWA, and his access to firearms, seemingly went unnoticed.

---

individual is not actually involved in the day-to-day operations of the business. *See id.* at 288–89.

Then, trouble crept up again around early 2016. Warner's house was broken into, and several firearms belonging to EWA were stolen. Warner reported the theft, and ATF's subsequent investigation raised its suspicions that Warner still had access to firearms and remained heavily involved with EWA. ATF then began another compliance inspection and realized that Warner "was really the owner of the business" and still had "direct access to [EWA's] firearms." R. Vol. IV at 317–18. Accordingly, ATF hand-delivered another letter to Warner, notifying him again of the limitations on his access to firearms.

In November 2016, ATF agents returned to EWA for a routine inspection. That inspection raised more red flags: the business had workbenches with firearms and parts laid out, bins with gun parts, and an open gun safe with a variety of firearms inside—all of which Warner could easily access. An ATF agent reminded Warner once more that he could not have access to firearms, which Warner again acknowledged.

By 2017, ATF learned that Warner remained extensively involved in EWA's business. Because of Warner's continued non-compliance with ATF's warnings, ATF ultimately revoked EWA's FFL in early 2018. But the FFL revocation did not stop Warner. Warner took EWA's inventory to his house and took its business online, using an existing EWA Facebook page to field customer inquiries and market firearms. For over a year, Warner continued to sell guns.

In September 2019, ATF received a tip about Warner's continued involvement with firearms and his operation of the EWA Facebook page, which led ATF to re-

5

investigate him.  When an ATF agent reviewed public content on the EWA Facebook page, he noticed that the phone number attached to the page belonged to Warner, and he observed photographs of firearms and posts indicating that the firearms were for sale.  Based on that information, ATF agents applied for and received a search warrant for the Facebook page's records.  Those records corroborated ATF's suspicions that Warner was using the Facebook page to advertise firearms for sale.

Because of ATF's suspicions, agents decided to set up a sting operation.  In October 2019, ATF Special Agent Samuel Supnick, acting undercover, contacted Warner and asked him about the possibility of purchasing a firearm.  Over a series of recorded phone calls and a handful of text messages, the two men extensively discussed the firearm's specifications.  In these conversations, Warner assured Supnick that the firearm would be Warner's own custom work and that, because EWA's FFL had been revoked, the firearm would be Warner's "personal project."  Warner and Supnick then arranged a time for Supnick to drop off an in-person deposit at Warner's house.

When Supnick went to Warner's house, Supnick (wearing a concealed camera) observed numerous firearms and firearm components lying around.  Supnick paid the deposit, and Warner gave him an invoice.  Based on this interaction and Supnick's observations, Supnick and ATF obtained a warrant to search Warner's home that same day.  The search revealed firearms, firearm parts, ammunition, and equipment used for the manufacture of firearms.  Agents seized this evidence, as well as two of Warner's computers and a number of EWA-related business records.  The computers

6

were not immediately searched. Instead, they were securely held in evidence and searched approximately eight months later, pursuant to a subsequent search warrant.

Based on the evidence discovered during the search of his home, Warner was indicted and ultimately convicted of the charges that are the subject of this appeal. Before trial, Warner filed a motion to dismiss the felon-in-possession charge and a motion to suppress the evidence seized from his two computers pursuant to the two search warrants. The district court denied both motions.

At trial, Warner testified, among other things, that he had been around firearms his entire life and that he knew he was a convicted felon, but that he did not know he was not allowed to possess firearms under federal law as a result of being a felon. He also admitted that, at that present time, he currently possessed firearms and had received deposits from would-be customers for future firearm builds. Following the four-day trial, the jury convicted Warner of both counts.

At sentencing, the district court heard from two expert witnesses: ATF Special Agent Derek Wright and ATF Firearms Enforcement Officer Eve Eisenbise. The experts testified that 80 items meeting the legal definition of a "firearm" were recovered from Warner's house; 14 of those were in an operable, ready-to-fire state, and 66 were frames or receivers. The court used their testimony and reports to determine that it would apply a sentencing enhancement under U.S.S.G. § 2K2.1(b)(1)(C) for possessing between 25 and 99 firearms. Although that sentencing enhancement produced a sentencing guideline range of 63 to 78 months,

the district court ultimately applied a downward variance, sentencing Warner to a term of 33 months' imprisonment.

Warner timely appealed his convictions, the denial of his suppression motion, and the counting of the firearms in his possession.

## II.

Warner first challenges the denial of his pre-trial motion to dismiss his felon-in-possession charge, arguing that his indictment on that charge was defective because he is not a person prohibited from possessing a firearm under 18 U.S.C. § 922(g)(1). "We generally review a district court's denial of a motion to dismiss a criminal indictment for abuse of discretion, but review any statutory interpretation issues involved in the ruling de novo." *United States v. Berres*, 777 F.3d 1083, 1089 (10th Cir. 2015). Whether Warner is a "prohibited person" within the meaning of § 922(g)(1) is a question of statutory interpretation, so we review the issue de novo.

Warner raises several arguments as to why he should not be considered a person prohibited from possessing a firearm under § 922(g)(1). First, he contends that neither of his prior convictions are proper predicate offenses under the statute. Under § 922(g)(1), an individual is prohibited from possessing a firearm or ammunition if the individual has been convicted of "a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). Relying on our decision in *United States v. Hisey*, 12 F.4th 1231 (10th Cir. 2021), Warner argues that his South Carolina felony convictions do not qualify as proper predicate offenses

8

because they were not actually punished by terms of imprisonment of over a year—instead, Warner was sentenced only to a term of probation for each offense.

But, as Warner concedes, he failed to raise his *Hisey* argument before the district court. "We ordinarily deem arguments that litigants fail to present before the district court but then subsequently urge on appeal to be forfeited." *Havens v. Colo. Dep't of Corrs.*, 897 F.3d 1250, 1259 (10th Cir. 2018); *cf.* Fed. R. Crim. Proc. 12(b)(3)(B) (requiring criminal defendants to raise arguments concerning defective indictments before trial). We generally review such forfeited arguments for plain error. *See Havens*, 897 F.3d at 1259. In the context of Rule 12 pre-trial motions, however, "we will not conduct plain-error review for 'an untimely Rule 12 argument' in the absence of good cause." *United States v. Herrera*, 51 F.4th 1226, 1271 (10th Cir. 2022) (quoting *United States v. Bowline*, 917 F.3d 1227, 1237 (10th Cir. 2019).

Warner submits that he did not waive his *Hisey* argument by failing to raise it in his pre-trial motion, and that even if he did, he has demonstrated good cause for doing so because *Hisey* was decided shortly before the trial began (and nine months after he filed his motion). But even assuming Warner could satisfy the good-cause requirement and clear the way for plain-error review, Warner's argument would still fail because he failed to argue plain error on appeal.

To prevail on plain error, Warner would need to show that "(1) the district court erred, (2) the error was plain, (3) the error prejudiced his substantial rights, and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Thornton*, 846 F.3d 1110, 1114 (10th Cir. 2017). But when a litigant

"fails to make a plain-error argument on appeal, we ordinarily deem the issue waived (rather than merely forfeited) and decline to review the issue at all—for plain error or otherwise." *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019). Thus, "[e]ven if we were to allow plain-error review," Warner's argument fails because he has "not requested review for plain error." *Herrera*, 51 F.4th at 1271.[3] Warner has therefore waived his claim that, under *Hisey*, his South Carolina convictions are not proper predicate offenses as defined by § 922(g)(1).

Next, Warner argues that he should not be considered a prohibited person under § 922(g)(1) because he has had a substantial number of his civil rights restored following his South Carolina felony convictions. In support of this argument, Warner points to 18 U.S.C. § 921(a)(20)(B), which provides an exception to § 922(g)(1) for "any conviction . . . for which a person . . . has had civil rights restored." Warner claims that he has had a core "civil right[] restored" because he has regained his right to possess a firearm under South Carolina state law—and so, he says, he falls under the exception in § 921(a)(20)(B).

The problem for Warner is that he has not had other key civil rights restored following his South Carolina felony convictions. We have previously held that "the rights to vote, *serve on a jury*, and hold public office, as well as the right to possess

---

[3] Warner does mention the plain-error standard in his reply brief, but he makes no meaningful argument applying that standard. *See* Reply Br. at 4. Although "we have left open the door for a criminal defendant to argue error in an opening brief and then allege plain error in a reply brief after the Government asserts waiver," our decision to review such an argument is discretionary. *Leffler*, 942 F.3d at 1198. Given Warner's briefing deficiencies, we decline to review his *Hisey* argument.

10

firearms, must *all* be restored under § 921(a)(20) before a prior conviction may be excluded on the basis of civil rights." *United States v. Flower*, 29 F.3d 530, 535 (10th Cir. 1994) (emphases in original).  Warner acknowledged before the district court (and in his opening brief on appeal) that, in South Carolina, the right to serve on a jury "is restored only by pardon from the Probation, Parole, and Pardon Board." R. Vol. I at 139 (citing S.C. Code Ann. §§ 14-7-810(1), 24-21-920).  Warner has never received any such pardon.  Thus, Warner's "civil rights have not adequately been restored to disqualify the use of [his South Carolina] convictions as predicate convictions" under § 922(g)(1).  *Flower*, 29 F.3d at 536.

Warner also argues that his South Carolina convictions fall under the "business practices" exception found in § 921(a)(20)(A).  Under that exception, a "crime punishable by imprisonment for a term of one year" does not include federal or state offenses "pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses *relating to the regulation of business practices*."  18 U.S.C. § 921(a)(20)(A) (emphasis added).  According to Warner, the South Carolina offense for which he was convicted—breach of trust with fraudulent intent—is "one in which business practices are regulated" because it involves "the existence of a trust relationship."  Aplt. Br. at 25.

That is incorrect.  The South Carolina crime of breach of trust with fraudulent intent is not an offense "relating to the regulation of business practices."  Nor is it similar to laws addressing "antitrust violations, unfair trade practices, [or] restraints of trade"— the other types of offenses that § 921(a)(20)(A) encompasses.  Instead, breach of trust

11

with fraudulent intent is similar to common-law embezzlement:  it "includes all of the elements of larceny or in common parlance, stealing, except the unlawful taking in the beginning."  *State v. Scott*, 497 S.E.2d 735, 738 (S.C. Ct. App. 1998) (quoting *State v. Owings*, 31 S.E.2d 906, 907 (S.C. 1944)) (internal quotation marks omitted).  Larceny, meanwhile, is the "felonious taking and carrying away of the goods of another against the owner's will or without his consent"—a crime against possession, not a crime related to business practices.  *State v. Keith*, 325 S.E.2d 325, 326 (S.C. 1985) (quotation omitted).  And although the trust relationship involved in a breach-of-trust offense often arises in the context of business relationships, nothing indicates that the crime necessarily involves or regulates any business practices.  *Cf. State v. Parris*, 611 S.E.2d 501, 503 (S.C. 2005) (noting that a trust relationship requires only that "the transferor of the property must intend that the trustee will act for the transferor's benefit instead of on his own behalf").  Because Warner's convictions in no way pertain to the regulation of business practices, we reject his argument that the convictions fall under § 921(a)(20)(A).

Finally, Warner makes a constitutional argument that § 922(g)(1) is unconstitutional as applied to him.  In essence, Warner argues that the Second Amendment prohibits the application of § 922(g)(1) to non-violent felons like himself, because non-violent felons are not dangerous and therefore retain the same right to keep and bear arms as do non-felons.  That is especially so, Warner claims, because his past convictions are decades old, did not subject him to a term of imprisonment, and would today be treated only as a misdemeanor under state law.

"Like most rights, the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). In *Heller*, the Supreme Court cautioned that "nothing in [the Court's] opinion should be taken to cast doubt" on "longstanding prohibitions on the possession of firearms by felons." *Id.* Relying on that language from *Heller*, this Court rejected a constitutional challenge to § 922(g)(1) in *United States v. McCane*, 573 F.3d 1037, 1048 (10th Cir. 2009), *cert. denied*, 559 U.S. 970 (2010).

Two years after *Heller* and one year after *McCane*, a plurality of the Supreme Court "repeat[ed]" its "assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality) (quoting *Heller*, 554 U.S. at 626). And although the Court eventually announced a new framework governing Second Amendment challenges in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), several justices emphasized in separate opinions that the decision there "decide[d] nothing about who may lawfully possess a firearm," *id.* at 72 (Alito, J., concurring), and that the decision did not undermine the "presumptively lawful" felon-dispossession laws that *Heller* seemingly preserved, *id.* at 80–81 (Kavanaugh, J., concurring).

With that in mind, Warner's constitutional challenge would seem squarely foreclosed by Supreme Court and Tenth Circuit precedent. But there is a wrinkle to all of this. During the pendency of this appeal, the Second Amendment landscape has evolved significantly. In September 2023, just a week before oral argument in

13

this case, this Court decided *Vincent v. Garland*, where we reaffirmed our decision in *McCane* (after *Bruen*) and further held that § 922(g)(1) is constitutional, whether as applied to violent or non-violent felons.  80 F.4th 1197, 1201–02 (10th Cir. 2023).  Then, in June 2024, the Supreme Court decided *United States v. Rahimi*, upholding a federal law that prohibited individuals subject to domestic violence restraining orders, who were found to present a credible threat to the physical safety of others, from possessing firearms.  602 U.S. 680, 690 (2024).  And, like the decisions before it, *Rahimi* repeated the Court's prior assurances that felon-dispossession laws are "presumptively lawful."  *Id.* at 682 (quoting *Heller*, 554 U.S. at 626, 627 n.6).

In light of *Rahimi*, the Supreme Court vacated our decision in *Vincent v. Garland* and remanded for us to reconsider it in light of the intervening precedent.  *Vincent v. Garland*, 144 S.Ct. 2708 (2024) (mem.).  On remand, we concluded that *Rahimi* did not abrogate *McCane*.  *Vincent v. Bondi*, 127 F.4th 1263 (10th Cir. 2025).  We therefore held that even after *Rahimi*, § 922(g)(1) is constitutional as applied to non-violent felons.  *Id.*[4]

---

[4] As we noted in *Bondi*, three other circuits have likewise readopted their earlier precedents upholding the constitutionality of § 922(g)(1), even after *Rahimi*. *United States v. Hunt*, 123 F.4th 697, 703–04 (4th Cir. 2024); *United States v. Jackson*, 110 F.4th 1120, 1125 (8th Cir. 2024); *United States v. Hester*, 2024 WL 4100901, at *1 (11th Cir. Sept. 6, 2024) (per curiam).  Two other circuits held after *Rahimi* that their existing precedents have been abrogated, but both relied on *Bruen* to reach that conclusion.  *Range v. Att'y Gen. U.S.*, 124 F.4th 218, 225–26 (3d Cir. 2024); *United States v. Diaz*, 116 F.4th 458, 465 (5th Cir. 2024).  The Sixth Circuit, meanwhile, has expressly recognized that *Rahimi* abrogated its prior decisions regarding § 922(g)(1).  *United States v. Williams*, 113 F.4th 637, 648 (6th Cir. 2024).  Considering the issue anew, the Sixth Circuit held that "§ 922(g)(1) is constitutional

All told, the shifting Second Amendment landscape does not change the outcome here. Our decision in *Vincent v. Garland*, as reaffirmed in *Vincent v. Bondi*, governs Warner's constitutional challenge. Under those decisions, § 922(g)(1) is constitutional as applied to Warner.

Accordingly, we hold that Warner is a "prohibited person" under 18 U.S.C. § 922(g)(1) and that the statute is constitutional as applied to him.

### III.

Next, we review the denial of Warner's motion to suppress evidence seized pursuant to the initial search warrant that ATF and Agent Supnick executed at Warner's home, which were later searched pursuant to a subsequent warrant. In short, Warner argues that the search of his computers violated the Fourth Amendment because the search warrants were overbroad and because the eight-month delay between ATF seizing his computers and searching them was unreasonable.

In reviewing the denial of a motion to suppress evidence, we accept the district court's "factual findings unless clearly erroneous, and view the evidence in the light most favorable to the district court's findings." *United States v. Finnigin*, 113 F.3d 1182, 1184 (10th Cir. 1997). That said, the "ultimate determination of the reasonableness of a search under the Fourth Amendment is a question of law[,] which we review de novo." *Id.* Part and parcel with this reasonableness determination, we

---

on its face and as applied to dangerous people," but not as applied to individuals convicted of "crimes that pose no threat of physical danger." *Id.* at 662–63.

review the "district court's probable-cause determination de novo." *United States v. Biglow*, 562 F.3d 1272, 1280–81 (10th Cir. 2009).

But the very most relief that we can provide in reversing a denial of a motion to suppress is the total exclusion of the evidence in question. In other words, all that Warner can hope to gain from a reversal of the district court's denial of his suppression motion is for this Court to extract from the case any instances where the evidence in question was used and to determine whether those uses were harmful.

This does not help Warner. At trial, the district court barred the government from introducing almost all of the evidence—with the exception of a single exhibit—obtained from the search of Warner's computers, mainly on grounds related to chain-of-custody and foundation issues. R. Vol. IV at 387–438. The sole exhibit that the district court admitted into evidence consisted of a text message from November 14, which was found on Warner's computer; the exhibit was admitted solely to impeach some of Warner's testimony. *Id.* at 761–67. And because that exhibit was used solely for impeachment—and was not admitted during the prosecution's case-in-chief—it could have been admitted even if the district court had granted Warner's suppression motion. *See United States v. Leon*, 468 U.S. 897, 910 (1984) ("Evidence obtained in violation of the Fourth Amendment and inadmissible in the prosecution's case in chief may be used to impeach a defendant's direct testimony.").

Thus, none of the evidence that Warner sought to suppress actually came in during the prosecution's case-in-chief. With that in mind, we need not reach the merits of Warner's argument, because reversing the denial of Warner's suppression

16

motion would provide him no relief.  We therefore hold that any alleged error in denying Warner's suppression motion was "harmless beyond a reasonable doubt." *United States v. Mullikin*, 758 F.3d 1209, 1211–12 (10th Cir. 2014) (quotation omitted) (holding that any potential error in denying motion to suppress was harmless where "[v]ery little of the evidence" challenged in the suppression motion was actually introduced at trial).[5]

## IV.

We now turn to Warner's argument that the evidence was insufficient to support his conviction for dealing in firearms without a license.  We review the sufficiency of the evidence de novo.  *United States v. Gregory*, 54 F.4th 1183, 1192 (10th Cir. 2022).  In doing so, "[w]e view the evidence in the light most favorable to the government to determine whether a rational trier of fact could have found the elements of the offense beyond a reasonable doubt."  *United States v. Sparks*, 791 F.3d 1188, 1190–91 (10th Cir. 2015).

The evidence presented to the jury included, among other things, evidence that Warner extensively participated in operating EWA; evidence from EWA's Facebook

---

[5] The government asks us to treat Warner's challenge as moot, relying on the proposition that "[a]n issue becomes moot when it becomes impossible for the court to grant 'any effectual relief whatsoever' on that issue to a prevailing party."  *Smith v. Plati*, 258 F.3d 1167, 1179 (10th Cir. 2001) (quoting *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)).  But that principle applies only when some event or factual circumstance "occurs while a case is pending on appeal" that makes it "thereafter impossible" for a court to grant effectual relief.  *Church of Scientology*, 506 U.S. at 12.  No intervening event has occurred here.  Accordingly, we reject Warner's argument based on harmless error, not mootness.

page, including posts and messages between Warner and prospective customers about firearm builds; invoices and firearm blueprints; and recorded calls with Agent Supnick.  In light of that evidence—viewed in the light most favorable to the government—we conclude that a reasonable jury could find beyond a reasonable doubt that Warner was guilty of dealing firearms without a license.

To see why the evidence was sufficient to convict Warner, consider the elements of the charge.  In order to convict Warner for dealing in firearms without a license, the jury had to find three things:  (1) that Warner was a dealer of firearms on October 28, 2019, the date of the indictment, who transacted in the business of selling firearms; (2) that Warner was engaged in such business without a proper FFL; and (3) that Warner was willfully engaged in this business on the day in question and with the knowledge that his conduct was unlawful.  R. Vol. I at 558.  Warner concedes, as related to the second element, that he did not (and could not) possess a proper FFL on the date in question.  Aplt. Br. at 40.  But he argues that the government's evidence was insufficient to satisfy the first and third elements.

As to the first element, the jury needed to find that Warner was "engaged in the business of selling firearms at wholesale or retail," that he was "engaged in the business of repairing firearms or of making or fitting special barrels," or that he was a "pawnbroker."  18 U.S.C. § 921(a)(11); R. Vol. I at 559.  Warner argues that his sale of a firearm to Agent Supnick demonstrates only a single instance of selling a firearm, which he claims is insufficient to show that he was a firearms "dealer" at the

relevant time.  Likewise, Warner insists that his Facebook posts were too isolated to constitute a firearms "business."

But the jury heard evidence indicating that Warner continually sold firearms to EWA customers, long before his interactions with Agent Supnick.  For example, Warner told one customer, via the Facebook page, that they could "direct order" a gun from him.  Supp. R. at 53.  He told another customer that the guns offered were "made from scratch."  *Id.* at 47.  Both of these conversations took place after EWA had already lost its FFL.  And beyond these conversations and others like them, the government also presented evidence of invoices and receipts for firearms-related transactions with 2019 dates—in the time after EWA's FFL was rescinded.  All of that evidence was sufficient for a jury to conclude that Warner's Facebook posts and his sale to Agent Supnick were not isolated incidents, and instead that Warner was a firearms dealer.

As to the third element, the evidence was likewise sufficient for the jury to conclude that Warner was willfully engaged in the business of firearms dealing because he acted with the knowledge that his conduct was unlawful.  The heaps of evidence regarding Warner's ongoing sales and interactions with customers supplied one basis for that conclusion.  But so too did the government's evidence that Warner intentionally hid his involvement with EWA—such as by deliberately omitting his name from EWA's initial FFL application—and that Warner received multiple notices from ATF regarding his convicted status, which he repeatedly acknowledged.  From this evidence, the jury could easily conclude that Warner willfully continued to

manufacture, handle, and sell firearms, despite knowing that he was prohibited from doing so.[6] We therefore hold that the evidence was sufficient to convict Warner of dealing in firearms without a license.

### V.

Finally, we consider Warner's argument that the district court, when applying the sentencing enhancement, improperly counted the number of firearms in his possession. This argument presents a mixed question of fact and law. Accordingly, we review any relevant factual findings for clear error and any relevant legal determinations de novo. *See United States v. McDonald*, 43 F.4th 1090, 1095 (10th Cir. 2023). Under this standard, we "will not disturb the district court's factual findings unless they have no basis in the record, and we view the evidence and

---

[6] As part of his sufficiency-of-the-evidence challenge, Warner also briefly suggests that much of the government's evidence was improperly admitted because it pertained to Warner's sales and other conduct predating October 28, 2019. Aplt. Br. at 38–40. That is wrong. First, that evidence was relevant to show that Warner had a long history of working with and selling firearms, and that Warner continued to do so after EWA's FFL was revoked and despite knowing that his conduct was unlawful. In that way, the evidence was relevant to show that Warner was operating a firearms "business" (rather than transacting an isolated sale) with the requisite mental state. Second, even if there were some basis to conclude that the evidence had been improperly admitted, it would not affect our conclusion. That is because, "[w]hen considering a challenge to the sufficiency of the evidence, we consider all evidence admitted at trial, even if admitted improperly." *United States v. Fernandez*, 24 F.4th 1321, 1327 (10th Cir. 2022) (quotation omitted).

inferences therefrom in the light most favorable to the district court's determination." *United States v. Hoyle*, 751 F.3d 1167, 1174 (10th Cir. 2014).

Under the Sentencing Guidelines, a defendant's sentence for certain firearms-related offenses may be enhanced by six offense levels if the offense involved 25 to 99 firearms.  U.S.S.G. § 2K2.1(b)(1)(C).  For purposes of counting the number of firearms involved in an offense, § 2K2.1(b)(1)(C) defines a "firearm" in the same way as 18 U.S.C. § 921(a)(3):  a firearm is "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon, (C) any firearm muffler or firearm silencer; or (D) any destructive device."  *See* Application Note 1 to U.S.S.G. § 2K2.1(b)(1)(C).

Relying on the expert testimony of two ATF officers—Agent Derek Wright and Officer Eve Eisenbise—the district court found that Warner possessed 80 firearms (including frames and receivers) at the time of the offense.  Based on that finding, the district court applied the six-level enhancement to Warner's offense.

Warner challenges the district court's finding, arguing that the total number of firearms should be lower because several weapons found during the search of his home did not qualify as "firearms" under the definitions provided by U.S.S.G. § 2K2.1(b)(1)(C) and 18 U.S.C. § 921(a)(3).  In particular, Warner attacks Officer Eisenbise's expert testimony.  Officer Eisenbise testified that she examined 67 items that were recovered from Warner's home and determined that 66 of those items

qualified as firearms (including as frames or receivers).[7]  According to Warner,

Officer Eisenbise "admitted" that her determination "is in direct conflict" with the

definition of a "frame or receiver" under the federal regulations.  Aplt. Br. at 46.

Warner also claims that Officer Eisenbise failed "to apply objective, well-known and

published criteria" or to "explain what 'critical features' . . . led to her conclusion

that the exhibits were frames or receivers."  *Id.* at 46–47.  And despite those alleged

flaws, Warner argues, the district court blindly accepted Officer Eisenbise's

testimony simply "because she said so."  *Id.* at 46.[8]

That argument fails.  For one thing, Officer Eisenbise's determination does not

conflict with the federal definition of a "frame or receiver"—and she never admitted

otherwise.  To the contrary, Officer Eisenbise stated on cross-examination that "the

only definition" of a frame or receiver that ATF applies is the definition supplied by

federal regulations.  R. Vol. IV at 699.  And although ATF has internally determined

which features of particular firearms models satisfy that definition, Officer Eisenbise

emphasized that she did not make those pre-existing determinations herself, but

---

[7] There were 14 other items recovered during the search that the district found, pursuant to Agent Wright's testimony, also qualified as "firearms" under the federal regulations (and which, unlike the other 66 firearms, were in a ready-to-fire condition).  Warner does not dispute that these 14 recovered items qualify as firearms.  Thus, the total tally of Warner's firearms comes out to 80.

[8] Notably, Warner acknowledges that even if the number of firearms in his possession had been counted in the manner that he urges, his recommended sentencing range still would have been 41 to 51 months.  Aplt. Br. at 17.  But Warner was sentenced only to a total of 33 months' imprisonment, a sentence considerably below both the lower end of the guidelines range and the range that Warner believes should have been generated without the sentencing enhancement.

instead merely applied them in her evaluation. *Id.* at 697–98, 701–02. Moreover, Officer Eisenbise explained at length the process she used to determine which of the 67 items qualified as frames or receivers. In her pre-sentence expert report, Officer Eisenbise detailed each item she analyzed and described—with reference to the federal regulations—which of their components made them frames or receivers. Given those detailed explanations, and viewing Officer Eisenbise's testimony "in the light most favorable to the district court's determination," we conclude that the district court's conclusion has a firm "basis in the record." *Hoyle*, 751 F.3d at 1174.

Accordingly, we affirm the finding that Warner possessed between 25 and 99 firearms in his possession at the time of the offense, and we likewise affirm the district court's application of the six-level sentencing enhancement.

## VI.

For the foregoing reasons, we AFFIRM.